Kimberly **WEINSHEIMER**, Plaintiff,

v.

**ROCKWELL INTERNATIONAL CORPORATION**, Defendant.

**No. 88–73–Civ–Orl–19.**

United States District Court,
M.D. Florida,
Orlando Division.

Nov. 23, 1990.

**1560**

Robert T. Burger, Jeffrey A. Ville, Burger & Ville, Indian Harbour Beach, Fla., for plaintiff.

Peter W. Zinober, Edwin J. Turanchik, Zinober & Burr, Tampa, Fla., Adrienne Fechter, David J. Shapiro, El Segundo, Cal., for defendant.

## MEMORANDUM OPINION

WALTER E. HOFFMAN, Senior District Judge.

Kimberly Weinsheimer brings this action against her employer, Rockwell International Corporation,[1] alleging sexual harassment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. She charges Rockwell International with maintaining a hostile and abusive work environment constituting sexual harassment based upon the alleged acts of some of its employees.

## I. FACTS

Plaintiff Kimberly Weinsheimer (Weinsheimer), a woman of twenty-nine years at the time of trial, began employment with the defendant Rockwell International Corporation (Rockwell) on May 14, 1979. Weinsheimer began work as a file technician and was later moved to a position as a Thermal Protection Inspector. It was this position which she held during the period in question in this suit. After the events at issue here she was subsequently assigned as a Configuration Management Specialist. Weinsheimer remains employed with Rockwell at the present time.

Weinsheimer worked at Rockwell's operations at the Kennedy Space Center (KSC) in Brevard County, Florida. During the time involved in this suit Rockwell's KSC operations were conducting work for the National Aeronautics and Space Administration (NASA) on the Space Shuttle orbiter. Weinsheimer's specific employment location, as well as that of the individuals whose conduct she complains of, was Building K6–1095, also known as the "back shop" or the "tile shop." This building, or a portion of it, was further called the SIP Bond Room. At this location employees of Rockwell would bond thermal insulation ("SIP") onto tiles destined to become the skin and heat protection for the space shuttle. Rockwell would then forward the tiles to Lockheed Corporation, which was NASA's prime contractor for the space shuttle. Lockheed would place the tiles on the orbiter.

As is understandable, and even expected, in work of this obvious import, quality was essential. In the back shop at Rockwell the actual manufacture of the bonded tiles was done by technicians or "techs." Their work was then inspected by inspectors or "QC's."[2] The inspectors would verify that the operations were done to the correct specifications and quality and would "pass" the work or send it back to be redone, as appropriate. Weinsheimer was one of these inspectors whose task it was to evaluate the work of the technicians. In order to ensure work of high quality, the technicians and inspectors belonged to two separate "chains of command," each with their own supervisory channels. Inspectors thus had no supervisory authority, as such, over technicians, although they did have final say as to whether a technician's work would be accepted. Technicians and inspectors each reported to different superiors and their performance evaluations, discipline and other like matters were kept separate.

---

1. Plaintiff's case as originally brought also included Jack Browning, a co-worker, as a named defendant. On defendants' motion Browning was dismissed by Judge Patricia E. Fawcett upon a finding that Weinsheimer had not named Browning in a prior state discrimination proceeding. Prior administrative action, at either the federal or the state level, is a prerequisite to proceeding at law under Title VII. See 42 U.S.C. § 2000e–5(f)(1) (1988); Hamm v. Members of Board of Regents of State of Florida, 708 F.2d 647, 650 (11th Cir.1983).

2. This stands for "Quality Control" presumably. As noted, Weinsheimer's official duty title was Thermal Protection Inspector.

Weinsheimer worked as an inspector in the back shop during the period in issue, approximately November 1985 through June 1986. At trial she sought to establish that the environment in the back shop was one of sexual abuse and harassment directed at herself primarily, and to some extent towards other women. Weinsheimer presented testimony that one of the technicians in the back shop, Kenneth Stoner, repeatedly verbally harassed her by asking her "several times" a week beginning in November 1985 to "suck him" or "give him head." [3] Other testimony also indicated that Stoner may have pointed to Weinsheimer's crotch and said "Give me some of that stuff," in November 1985 and on further occasions may have grabbed Weinsheimer at the crotch and breast.

Plaintiff's case also alleged other incidents of Stoner. Also in November 1985 he is said to have held a knife to Weinsheimer's throat in a break room. In late 1985 or early 1986 he was said to have shoved or pushed Weinsheimer into a filing cabinet. In early 1986 he is alleged to have threatened to "bang her head into the ground." Weinsheimer and others also testified that Stoner, as well as other technicians, frequently passed gas or belched in their presence.

Weinsheimer also presented claims of harassment by individuals other than Stoner. Another technician, Kenneth Edmondson, is alleged to have exposed his penis and placed it in Weinsheimer's hand while she was working and looking away, supposedly encouraged to do this act by a nearby Stoner. Weinsheimer did not see Edmondson's penis, but states she heard his zipper going back up. A supervisor of the technicians, Jack Browning, is claimed to have patted Weinsheimer on the rear and at this time, or another, requested an "ice-cube job." [4]

Testimony by defendant Rockwell and its employees differed from plaintiff's as to the events in the back shop. Rockwell conceded that the back shop during this period was an environment replete with sexual innuendo, joke telling and general vulgarity. Its witnesses said that the banter and vulgarity was engaged in by nearly all employees there, male and female alike. Testimony was also heard that Weinsheimer herself was a participant in the sexual innuendo and vulgar storytelling and expressions. Weinsheimer was characterized as one of the more frequent and willing participants in the crude atmosphere prevailing in the back shop.

Rockwell's witnesses further sought to present evidence of Weinsheimer as a problem employee of sorts. While acknowledging her technical competence, Weinsheimer was said to have had a history of tardiness and sleeping on the job. Rockwell's evidence further showed Weinsheimer to be a very volatile person whose on-the-job fights, with Stoner in particular, were known to be vicious. Other testimony indicated that Weinsheimer was having continuing problems with her boyfriend at this time and that she engaged in loud and abusive phone calls with him from the back shop. In Rockwell's contention it was Weinsheimer's argumentative nature and the perception that she "got away with" her lateness and sleeping which underlay much of her problems in the back shop.

Weinsheimer testified that she had discussions with her supervisors, and those of the technicians, at Rockwell about the problem environment in the back shop. The supervisors in turn testified that her conversations with them, if any, were not taken by them to be complaints and that they concerned general problems regarding the back shop and not specifically sexual harassment.

On July 1, 1986 Weinsheimer took medical leave from Rockwell as a result the events described. Medical leave was granted based upon a letter from Weinsheimer's psychologist, Dr. Richard O'Halloran, in which he indicated that he diagnosed Weinsheimer as suffering from "industrial trau-

---

**3.** The latter phrase, like the former, apparently referring to oral sex.

**4.** While the witnesses were understandably reluctant to define or clarify the term, it is also an apparent reference to a variation of oral sex.

ma" due to the prevailing environment in the back shop. Some of her symptoms of industrial trauma included depression, anxiety, and sleep disturbances, as well as "distractability" and impaired concentration. Dr. O'Halloran recommended that Weinsheimer take time off from work. Weinsheimer returned from medical leave on November 24th.[5] This was initially on a part time basis, although plaintiff has since resumed full-time duties. She remains at Rockwell and has alleged no further harassment since her return.

Meanwhile, during July and August of Weinsheimer's medical leave, Rockwell initiated an investigation which looked into the incidents claimed by Weinsheimer, as well as into problems that employees or management expressed about the plaintiff. A company investigator was brought from California and interviewed the employees and supervisors in the back shop, including Weinsheimer. As a result of the investigation Stoner was given a two-week suspension without pay for various company rules' violations. His infractions included: "[t]hreatening ... or interfering with fellow employees;" "[m]aking of ... profane or malicious statements concerning an employee," "[i]nterfering with plant discipline or efficiency." Weinsheimer, when she returned, was also met by Rockwell to inform her of their efforts with regard to the back shop problems and also to advise her that in the future infractions such as tardiness and sleeping would be dealt with more uniformly.

Weinsheimer filed her charge with the appropriate state agency, the Florida Commission on Human Relations, on December 3, 1986 regarding the alleged sexual discrimination in the back shop. On December 10, 1986 the Florida Commission referred the complaint to the Miami District Office of the federal Equal Employment Opportunity Commission (EEOC).[6] Subsequently, in late 1987 the EEOC issued a Right-to-Sue Letter to the plaintiff regarding her charges. The complaint in this action was filed on January 26, 1988.[7]

## II. DISCUSSION

Weinsheimer pursues this case under Title VII of the Civil Rights Act of 1964 which declares that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (1988). Title VII's prohibition of discrimination based upon sex is now clearly held to include claims of sexual harassment. The courts have distinguished two kinds of such harassment claims: *quid pro quo* sexual harassment and "hostile work environment." Weinsheimer's current action is brought only under the second of those theories, that of hostile work environment.[8]

The Supreme Court in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), expressly ad-

5. Dr. O'Halloran's letter of July 1st originally anticipated that Weinsheimer would be able to return to work after only two weeks of leave, or by July 14th. It is unclear why plaintiff's medical leave extended until November 24th, a duration of over four and three-quarters' months. From the testimony, she remained under her doctor's care for the length of the period.

6. The state agency was unable to pursue the matter because under Florida law the complaint must be filed within 180 days of the alleged discriminatory acts. Weinsheimer's charge, filed December 3rd, did not complain of any acts beyond June 3rd, when her medical leave began. *See also* notes 7 and 18 *infra*.

7. The EEOC Right-to-Sue Letter is not in evidence before the Court, though testimony and pleadings place its issuance date in late October

or early November 1987. Its date would be of some significance as a Title VII complaint must be filed within 90 days of the letter's issuance. However the Court raised at trial the matter of whether the suit was timely brought with regard to the right-to-sue time period, and the point was apparently conceded or not at issue. Transcript at 57. *See also* notes 6 *supra* and 18 *infra*.

8. *Quid pro quo* sexual harassment, as the term is used, usually describes Title VII claims of the classic form where a male supervisor demands sexual favors from a female employee in exchange for job benefits. *See e.g. Henson v. City of Dundee*, 682 F.2d 897, 908–910 (11th Cir. 1982).

dressed and approved the hostile work environment theory of sexual discrimination under Title VII. The *Vinson* Court relied heavily upon the applicable EEOC Guidelines enacted under Title VII and upon an influential Eleventh Circuit opinion, *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982), in discussing the requirements for hostile work environment cases. *Vinson*, 477 U.S. at 66–68, 106 S.Ct. at 2405–2406, 91 L.Ed.2d 49. The Guidelines define sexual harassment as "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." 29 C.F.R. § 1604.11(a) (1985). The Guidelines continue and make such conduct actionable when "such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." 29 C.F.R. § 1604.11(a)(3) (1985). *See Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404–2405, 91 L.Ed.2d 49.

The Eleventh Circuit case cited heavily by the Supreme Court in *Vinson* was *Henson v. City of Dundee*, 682 F.2d 897 (11th Cir.1982), an early hostile environment sexual harassment case. *Henson* set out the elements of the hostile environment claim which have been widely used in this, and other, circuits. These elements, which must be proven, which constitute a violation of Title VII are:

(1) that the employee is a member of a protected class;

(2) that the employee was subject to unwelcome sexual harassment;

(3) that the harassment complained of was based upon sex;

(4) that the harassment complained of affected a "term, condition, or privilege" of employment; and

(5) that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Id.* at 903–905. *Accord Swentek v. USAir, Inc.*, 830 F.2d 552, 557 (4th Cir.1987); *Jones v. Flagship, Int'l.*, 793 F.2d 714, 719–720 (5th Cir.1986), *cert. denied*, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Rabidue v. Osceola Refining Company*, 805 F.2d 611, 619, 620 (6th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Hall v. Gus Construction Company, Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988).

In the instant case the evidence reveals that plaintiff has failed to sufficiently prove elements (2), (3) and (4) above.[9]

### A. *"Unwelcomeness"*

The Supreme Court has stated that the issue of "unwelcomeness" is at the center of Title VII claims. "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Vinson*, 477 U.S. at 68, 106 S.Ct. at 2406, 91 L.Ed.2d 49. In *Vinson* the Supreme Court remanded the case with explicit instructions for the trial court to consider, among other matters, evidence of that plaintiff's provocative dress and expressed public fantasies. The Court found such evidence "obviously relevant" to the "unwelcomeness" inquiry. *Id.* at 68–69, 106 S.Ct. at 2406, 91 L.Ed.2d 49.

This Court finds that the back shop at Rockwell during the time in controversy was characterized by an atmosphere of vulgarity and sexual innuendo. It is likely that a number of the incidents claimed by Weinsheimer did take place. Crude language and storytelling abounded, and defendant Rockwell has conceded as much in its pleadings and evidence. The clear weight of the testimony indicates that such banter was engaged in by generally all employees, male and female alike. Although denied by the plaintiff, strong evidence, as testified to by virtually every one of her co-workers, further supports the view that she was among the most preva-

---

9. It is undisputed that Weinsheimer, as a woman, is a member of a protected class under Title VII. The fifth element, employer liability, need not be addressed directly as this Court's ruling is based upon the lack of other necessary ele-

ments. However, the matter of Weinsheimer's complaints to management, if any, will be discussed in the text of this opinion in connection with other elements.

lent and graphic participants in this overall atmosphere.

In her own deposition, although not at trial, Weinshiemer states that she responded to Stoner's pointing to her crotch and asking her to "Give him some of that stuff" by saying, "No, that's my boyfriend's, and it's just like new, hardly been used." [10] Regarding another claimed incident, Browning stated that the only time he heard of the term "ice-cube job" was from Weinsheimer herself. Others testified that plaintiff told sexual stories or made sexual gestures at work, including mimicking oral sex motions. Edmondson stated that on one occasion Weinsheimer had shown him sexually oriented magazines that were in her locker. Such evidence of Weinsheimer's proven, active contribution to the sexually explicit environment of the back shop belies her contention that much of what occurred there was unwelcome.

This point is also borne out by the fact the Weinsheimer's alleged complaints to the management about the situation before July 1st were uniformly not taken as such by her supervisors. Each supervisor stated that they did not consider Weinsheimer's discussions with them as complaints regarding sexual harassment.[11] They described their conversations with her as centering on general morale, supervisory and disciplinary problems in the back shop. If sexual or harassing incidents were referenced to, such incidents were generally months old and Weinsheimer did not appear to be much troubled by them. Even for an incident as graphic as Edmondson's alleged placing of his penis in plaintiff's hand, the testimony established that Weinsheimer did not report this to management until months later, and then only by an off-hand reference during informal conver-

sation in a back stairwell with her supervisor, Mr. Arevalos. Similarly, regarding the knife incident, Weinsheimer in her deposition initially stated that she believed Stoner was kidding and that he did not intend to hurt her. This incident was also reported to management only after a lapse of some months.

Thus plaintiff's willing and frequent involvement in the sexual innuendo prevalent in her work area indicate that she did not find the majority of such conduct truly "unwelcome" or "hostile". This approach has been followed by other courts in appropriate circumstances as well. *See Perkins v. General Motors Corporation,* 709 F.Supp. 1487, 1500–1501 (W.D.Mo.1989) (Plaintiff was an "active, encouraging participant in sexually explicit conversations and actions."); *Loftin–Boggs v. City of Meridian,* 633 F.Supp. 1323, 1327–1327 (S.D. Miss.1986) (Plaintiff participated in frequent discussions and bantering about sex.), *aff'd,* 824 F.2d 971 (5th Cir.1987); *Gan v. Kepro Circuit Systems,* 28 F.E.P. Cases 639 (E.D.Mo.1982) (Plaintiff actively contributed to the distasteful working environment.) [12]

### B. *"Based Upon Sex"*

A further element of a Title VII plaintiff's sexual harassment case as set out above is the complained of conduct must be based upon sex. Conduct, whether salacious or not, can support a claim for sexual harassment. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987); *McKinney v. Dole,* 765 F.2d 1129, 1131–1139 (D.C.Cir.1985). The primary inquiry as to whether conduct is "based upon sex" is determining that "but for the fact of her sex, [the plaintiff] would not have been the

---

**10.** The Court notes that portions of plaintiff's depositions, and then her entire deposition testimony, were introduced by defendant at trial without objection. Transcript at 327.

**11.** The supervisors' testimony also indicates that Weinsheimer's discussions with them were far less frequent than the "weekly complaints" described by plaintiff.

**12.** The Court does not hold that this plaintiff's, or any plaintiff's, participation in actions of a

sexual or vulgar nature while at work will completely bar a claim of sexual harassment. Plaintiff simply must show that at some point she clearly made her co-workers and superiors aware that in the future such conduct would be considered "unwelcome." In the instant case plaintiff cannot be said to have done so until her June 1st taking of medical leave. *See also, Swentek v. USAir, Inc.,* 830 F.2d 552, 557 (4th Cir.1987); *Loftin–Boggs, supra* at 1327, n. 8.

object of harassment." *Henson,* 682 F.2d at 903–904. *Rabidue,* 805 F.2d at 620. In the present case, the evidence makes it very unclear that the alleged harassment of Weinsheimer was based upon sex.

As noted, the Court finds that it is likely that many of the events claimed by Weinsheimer did occur. This is not to say, and the Court does not find it likely, that these events occurred as Weinsheimer portrayed them. As described, the back shop was a place of prevalent vulgarity and sexual comment. The evidence discloses the banter to be gender-neutral, participated in by men and women alike. The Eleventh Circuit has held that Title VII likely does not apply to cases in which "the conduct complained of is equally offensive [13] to male and female workers." *Henson,* 682 F.2d at 904.

In the instant case it is probable that the prevalent vulgarity, and plaintiff's co-equal participation in it, contributed to and brought about many of the comments she complains of. They were not based upon sex, as such, but were merely continuations of, and part and parcel of, the pervading back shop environment. Evidence presented by both sides indicates that arguments were common between technicians and inspectors in the back shop.

Equally undermining of plaintiff's claim that the comments were directed at her because of her sex was the evidence showing her to have a confrontational and abusive personality. Weinsheimer's abusive and vulgar language with her boyfriend on the back shop telephone was well documented. Weinsheimer and Stoner engaged in frequent and heated fights, in which each party was equally proficient in their use of crude language. These fights would involve physical contact and poking. The testimony of other witnesses indicates that these altercations usually grew out of work or personal issues, rather than having a sexual animus.

Much of Weinsheimer's problems with the technicians is likely attributable to their perception that she was not held to the same standards as they were regarding tardiness or sleeping on the job.[14] Furthermore, both Weinsheimer's and Stoner's own testimony shows that another of the major incidents upon which plaintiff makes her case, that of Stoner pushing her into a locker, arose from clearly non-sexual causes.[15]

Title VII bars unwelcome harassment based upon sex. It would seem to be stretching the language and aims of the statute were it to now apply *per se* to any argument between coworkers of opposite sex that involves vulgarities or sexual comments. Rockwell's back shop had two marked characteristics, those of frequent contentiousness and vulgarity. The simple combination of these two traits should not, without more, equal a Title VII violation. In sum, the witnesses, both plaintiff's and defendant's attributed the bulk of the back shop's problems, and Weinsheimer's in particular, to general causes that were not sexually motivated.

---

**13.** Or, as the case may be, equally inoffensive.

**14.** This discrepancy apparently arose due to the separate supervisory chains of the technicians and the quality control inspectors. Alfred Carey, a supervisor of the inspectors, described the differing management techniques with an interesting choice of terms. Although the inspectors and the technicians had the same requirements to be on time and come to work, Carey thought his methods with the inspectors to be "a little more enlightened" in that he did not use "a stick [or] negative motivation much." On the other hand, Jack Browning's supervision of the technicians was described as "typically American, early twentieth century shop techniques, which [are] pretty tough."

Also apparently contributing to the technicians' suspicions in this regard was the fact that Weinsheimer's mother was a long-time Rockwell employee, and was secretary to an administrator in the personnel department at Rockwell.

**15.** Each described different circumstances however. Weinsheimer says the shoving incident grew out of an argument following her reprimand of Stoner for handling tiles with his bare hands. This was a proper exercise of her duties as an inspector. Stoner states that the shoving incident arose from an argument after Weinsheimer accused him of "setting her up" by bringing a Rockwell security team with a drug-sniffing dog to the lockers in their break area. In either case, it seems clear that the shoving was based not upon sex, but rather upon work or personal disputes.

## C. *"Sufficiently severe"*

The third element of the hostile environment claim which plaintiff's must sufficiently prove is that the harassment complained of affected a term, condition or privilege of employment. The Supreme Court has held that, regarding this element, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405, 91 L.Ed.2d 49 (*citing Henson*, 682 F.2d at 904.) The Eleventh Circuit has stated that "[w]hether sexual harassment at the workplace is sufficiently severe and persistent" looks to whether it "affect[s] seriously the psychological well being of [the employee]." *Henson*, 682 F.2d at 904. *See also, Hall v. Gus Construction Company, Inc.*, 842 F.2d 1010, 1014–1016 (8th Cir.1988) (Finding liability where there existed a "campaign of harassment" which was "systematically directed to" the plaintiff).

Except for the alleged incident involving indecent exposure, whose gravity the Court does not minimize, the allegations complained of by the plaintiff are shown to have been consistent with the general environment in the back shop. The comments, in both their nature and their causes, were apparently commonplace and routine in the back shop. They do not rise to the level of "sufficiently severe" required by Title VII.

Furthermore the weight of the evidence at trial shows that rather than the working environment affecting the psychological well-being of the plaintiff, it was Weinsheimer's personal difficulties that interfered with work. Although Dr. O'Halloran testified that Weinsheimer's medical leave and other difficulties would not have reached the level they did but for the conditions at work, a review of his treatment notes indicates the contrary.[16] These notes presumably reflect what he saw as significant during the course of Weinsheimer's

treatment. The overwhelming majority of O'Halloran's notations deal with Weinsheimer's boyfriend, family, or other personal problems. This is virtually exclusively the case during the period in which she was on medical leave and therefore not working in the back shop.[17] A major part of Weinsheimer's treatment therefore took place while she was not at work and dealt with issues not related to her working environment.

This finding is supported by the testimony of other witnesses that Weinsheimer's moods while at work were closely tied to the state of affairs with her boyfriend. Statements by these witnesses indicated that these moods would affect her work performance, by means of the frequent telephone calls previously mentioned, or by making her harder to get along with. Thus it appears clear in this case that the psychological well-being of the plaintiff was predominantly dependant upon external factors, and not greatly influenced by the alleged harassment at her workplace. *See, e.g. Highlander v. K.F.C. National Management Company*, 805 F.2d 644, 650 (6th Cir.1986) (Plaintiff's evidence failed to demonstrate that the working environment seriously affected her psychological well-being.); *Perkins v. General Motors Corporation*, 709 F.Supp. 1487, 1501 (W.D.Mo. 1989) (Plaintiff failed to satisfy burden that the few credible unwelcome incidents *reasonably* affected a term, condition or privilege of her employment.)

The Court notes that three recent Eleventh Circuit cases which on their face are favorable to Title VII plaintiffs all deal with facts more egregious than the instant one and, importantly, all reverse lower court grants of summary judgment to employer defendants. Hence in those cases the issue before the appellate court was solely whether the plaintiff had alleged a *prima facie* case sufficient to withstand a motion for summary judgment. *See Hud-*

---

**16.** The notes, as well as transcriptions thereof, were introduced into evidence at trial.

**17.** Those comments which do deal with issues related to plaintiff's employment with Rockwell generally concerned non-sexual matters, such as

reprimands for tardiness, substance-abuse allegations and the progress of this suit. The predominance of non-harassment related counseling is particularly prevalent in all but Weinsheimer's initial sessions.

*dleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir.1988) (Male employees clearly interfered with plaintiff's ability to greet customers on showroom floor.); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554 (11th Cir.1987) (Plaintiff alleged repeated, direct propositioning by her supervisor.); *Bell v. Crackin Good Bakers, Inc.*, 777 F.2d 1497 (11th Cir.1985) (Explicit evidence of threats to fire employee because of her sex and employee was subsequently dismissed.)

### III. CONCLUSION [18]

Based upon these findings and conclusions, Weinsheimer has failed to establish her claim that hostile environment sexual harassment existed in violation of Title VII of the Civil Rights Act of 1964 as a result of conditions in Rockwell's back shop. Accordingly final judgment will be entered in favor of the defendant.

---

**18.** Rockwell also claims that many of Weinsheimer's allegations are time barred. This argument rests upon the requirement of Title VII that filing of an EEOC claim is a necessary prerequisite to bringing an action at law. *Mahasco Corp. v. Silver*, 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). The statutory limitation for filing an EEOC charge applicable to the facts in this case is 300 days. *Thomas v.*

*Florida Power and Light Company*, 764 F.2d 768, 769 (11th Cir.1985). Rockwell would seek to exclude from the Court's consideration those events of late 1985 and early 1986 which occurred prior to 300 days before Weinsheimer's filing of administrative action with the EEOC on December 10th. The Court need not reach this issue in light of its rulings above.