Argued and submitted March 6, reversed in part; otherwise affirmed June 26, 2003

## Arthur GARCEZ,
*Appellant,*

*v.*

## FREIGHTLINER CORPORATION,
a Delaware corporation,
*Respondent.*

9912-13617; A112768

72 P3d 78

Maureen Leonard argued the cause for appellant. On the opening brief was Angela J. Hart. With Maureen Leonard on the reply brief were Roy Pulvers and Lindsay Hart Neil & Weigler LLP.

Jeffrey Kilmer argued the cause for respondent. With him on the brief were Gregory B. Snook and Kilmer, Voorhees & Laurick, P.C.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

BREWER, J.

## BREWER, J.

Plaintiff appeals from a judgment for defendant entered after the trial court granted defendant's motions to strike allegations from his complaint and for a directed verdict, which collectively disposed of plaintiff's two claims for race-based employment discrimination under 42 USC section 2000e-(2)(a) (2000).[1] We review those rulings for errors of law. *Harris v. Pameco Corp.*, 170 Or App 164, 166, 12 P3d 524 (2000) (stating standard for directed verdict); *Callahan v. Sellers*, 106 Or App 298, 300 n 1, 806 P2d 1176, *rev den*, 311 Or 349 (1991) (applying standard of review for denial of motion for directed verdict to denial at trial of motion to strike portion of pleading). We affirm the order striking plaintiff's claim for discriminatory discharge and reverse the directed verdict on his hostile work environment claim.[2]

We view the evidence in the light most favorable to plaintiff, the nonmoving party, to determine whether the jury reasonably could have inferred that defendant discriminated against plaintiff in the terms or conditions of work because of plaintiff's race. *Durham v. City of Portland*, 181 Or App 409, 421-22, 45 P3d 998 (2002). "If that inference may reasonably be drawn, then the claim should be submitted to the trier of fact." *Id.* at 422.

Plaintiff filed a complaint against defendant entitled "Complaint For Civil Rights Violations." The complaint lumped together, without separate statement, what plaintiff denominated as "State and Federal Claims for Discrimination [based on] ORS 659.030(1)(b) and 42 USC § 2000e-(2)(a)." The complaint alleged discriminatory discharge and hostile work environment theories of recovery under both

---

[1] 42 USC section 2000e-2 (2000) provides, in part:

"(a) Employer practices

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"

[2] The trial court also dismissed plaintiff's claims under *former* ORS 659.030 (1999), *renumbered as* ORS 659A.030 (2001). As explained below, those claims are not properly before us on appeal.

Oregon and federal law. Defendant did not file a motion under ORCP 21 to require plaintiff to state his claims separately. As will soon become apparent, the parties' failure to carefully distinguish among plaintiff's claims at various stages of the proceedings caused no small degree of confusion, both at trial and on appeal.

■ *Former* ORS 659.030(1)(b) provides that it is an unlawful employment practice "[f]or an employer, because of an individual's race * * * to discriminate against such individual in * * * terms, conditions or privileges of employment." Although the Oregon statute is patterned after 42 USC section 2000e, *Seitz v. Albina Human Resources Center,* 100 Or App 665, 672-73, 788 P2d 1004 (1990), unlike claims under the federal statute, claims under the Oregon statute are triable to the court. *See former* ORS 659.121(1) (1999), *repealed by* Or Laws 2001, ch 621, § 90; *see also* ORS 659A.885(1), (2) (the "judge shall determine the facts" in an action under ORS 659A.030, formerly ORS 659.030). Accordingly, plaintiff's state law claims were tried to the court, and his federal law claims were tried to a jury.[3]

The following evidence was admitted at trial. Plaintiff is a Hispanic male, who grew up in Southern California and Mexico and speaks Spanish as his first language. He worked for defendant, a trucking company, from April 1994 until May 1999, with the exception of an approximately six-week layoff around June 1996. During his employment, coworkers directed racial slurs such as "beaner, wetback [and] spick" at plaintiff while he was working on the shop floor. Plaintiff testified that, on several occasions, his identification badge was defaced by drawings of a sombrero and

---

[3] The trial court incorporated certain findings of fact and conclusions of law into its written order striking allegations from the complaint and for a directed verdict. The court was authorized to make findings and conclusions in connection with plaintiff's claims under *former* ORS 659.030(1)(b) because, as discussed, those claims were triable to the court. However, the order also included findings that are germane to the federal claims, which were tried to the jury and were not properly the subject of findings by the court. Defendant made no motions with respect to plaintiff's state law claims. Because the trial court's findings and conclusions could properly be considered only in reviewing its dismissal on the merits of the claims under *former* ORS 659.030(1)(b) and because, as we conclude below, plaintiff failed to assign error to the disposition of those claims, we do not further consider those findings and conclusions.

moustache and with words such as "wetback No. 4"; that a serape that was sent to him from Mexico was cut in half; and that, upon his return from a job-related trip to Mexico, his toolbox was defaced with writing such as "Go home, wetback." Plaintiff testified that he often retaliated by using racist language, including such terms as "whitey" and "honkey," in order to "adapt to [his] environment" and "fight fire with fire."

Plaintiff testified that he discussed the racial atmosphere in the workplace with his foreman, Larry Lisengang, a fellow union worker, who told plaintiff that he considered it "shop talk" and that plaintiff had to learn to deal with it. Plaintiff also testified that he "complained" to Lisengang about the defacement of his identification badge and toolbox. Plaintiff stated that, in 1996 or 1997, he told his section supervisor, Del Caulkins, that "This is a bunch of bullshit," referring to "all the racism and things that they would do to minorities on the line." According to plaintiff, Caulkins told him to file a formal complaint, but plaintiff did not do so because he "wanted to take care of the problem, because at [defendant company] you're taught to take care of your problems within your section * * *." He also testified that Caulkins told him "to learn to deal with it or—or ask for a transfer, or get another job."

Plaintiff reported his torn serape to another supervisor, Bob Jennings, who told plaintiff that there was nothing he could do unless plaintiff knew who did it. Plaintiff also testified that another supervisor, Marty Brusco-Davis, had been present when "racist slang was being used on the shop floor." Brusco-Davis stated that she thought plaintiff was the initiator of the racial banter, that it was a "game," and that she had warned plaintiff about complaints from coworkers that he was touching them inappropriately.

In July 1998, Jennings documented in plaintiff's personnel file that he had given plaintiff a verbal warning about his inappropriate touching of female coworkers. Jennings issued a "final" written warning, dated November 13, 1998, notifying plaintiff that he would be discharged if another such complaint was made about him. On November 20, plaintiff was involved in an altercation with a coworker that

resulted in plaintiff going to see the company nurse and taking a leave of absence. Plaintiff testified that, at that time, he told Jennings that the racial atmosphere was a "bunch of bull S, that how can—how can this company survive with all this racial bull—BS?," that Jennings "smirked" at him, and that plaintiff walked out of the office. Brusco-Davis stated that, "[o]n the day [plaintiff] had his nervous breakdown,"[4] plaintiff "made a somewhat babbling statement that people were picking on him because he was Hispanic," but that plaintiff "gave no names" so she could not pursue an investigation. Upon plaintiff's return from the leave of absence, he was transferred to another section of the plant with no loss in pay.

Plaintiff took another leave of absence during April 1999 because of his mother's death, and he returned to work on May 5, 1999. On May 19, 1999, a female coworker, Valda McCauley, complained to one of plaintiff's supervisors, Don Collins, that plaintiff had inappropriately touched her. McCauley was romantically involved with Collins at that time. Collins told plaintiff about the complaint and reported the incident to Gary Garr, defendant's personnel manager. Garr spoke with McCauley and asked Collins to speak with plaintiff. Plaintiff denied that the incident had occurred and made a written statement, at Collins' request, that he "never touched a woman that didn't want me to." Based on his review of plaintiff's personnel file and his determination that McCauley was more credible than plaintiff, Garr directed Collins to fire plaintiff. Plaintiff was immediately escorted from the shop floor on the day that he was terminated and his request to speak with a shop steward was denied.

In an effort to get his job back, plaintiff met with Garr and other management personnel on three occasions after he was discharged. Plaintiff testified that, at the first meeting after his firing, he did not discuss the racial atmosphere because he was "just worried about getting my job back. I could care less what was happening on the shop floor at that time." At a later meeting, Garr asked plaintiff what

---

[4] Presumably, that reference is to the events that occurred on November 20. Other than a passing reference in testimony by plaintiff, which was struck, and a mention of it by another witness, plaintiff offered no evidence, medical or otherwise, of a nervous breakdown.

remarks had been used on the floor and to write them down, but plaintiff did not comply with that request. At some point after his discharge, plaintiff asked to take a polygraph test, but he was told that it would not make a difference. Plaintiff filed a grievance with his union in connection with his discharge. The union investigated but decided not to pursue the grievance.

At the close of plaintiff's case-in-chief, defendant moved to strike two paragraphs of the complaint relating to plaintiff's discharge. Those paragraphs alleged that plaintiff was "not allowed to defend himself because of his race" and that he was "terminated because he was Hispanic." The trial court granted that motion. Defendant then moved for a directed verdict on the remaining portions of plaintiff's complaint, which related to plaintiff's claim that he was "subjected to a hostile work environment due to his race." The trial court also granted that motion. Finally, as noted, the court dismissed, on the merits, plaintiff's claims under *former* ORS 659.030(1)(b).

On appeal, plaintiff asserts, in two separate assignments of error, that the trial court erred in making those rulings because there was sufficient evidence for his claims to be submitted to the jury. Plaintiff's first assignment of error states that "[t]he court erred in sustaining the motion for dismissal of Plaintiff's Disparate Treatment claim when it struck, dismissed, and directed a verdict on Plaintiff's Disparate Treatment Claims." The second assignment of error states that "[t]he court erred in sustaining the motion for directed verdict as to Plaintiff's claims for relief for a hostile work environment created by racial animus."

We initially consider whether plaintiff's claims under *former* ORS 659.030 are properly before us on appeal. It is clear from an examination of the record that defendant's motions, as well as the trial court's rulings on them, were directed *only* to plaintiff's federal claims. Consistently with that focus, the substantive discussion in plaintiff's opening brief on appeal does not refer to Oregon law, nor does it identify any pertinent ruling in connection with the court's dismissal of plaintiff's Oregon law claims. Plaintiff discusses those claims for the first time on appeal in his reply brief.

Like the opening brief, plaintiff's reply brief focuses on federal law, although it does include citations to Oregon cases on which defendant relies for the proposition that "Oregon discrimination law generally mirrors federal law." However, even plaintiff's reply brief contains no reference to the standard of review applicable to his Oregon law claims or to the significance of the trial court's findings with respect to those claims. We decline to consider the trial court's dismissal of plaintiff's claims under *former* ORS 659.030(1)(b) because (1) that ruling is not fairly encompassed within plaintiff's assignments of error as framed in his opening brief, and (2) plaintiff's arguments pertaining to those claims are not adequately developed on appeal. *See* ORAP 5.45(1); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380-81, 823 P2d 956 (1991) (where appellant raised issue for first time in reply brief, that argument was not properly raised on appeal); *see also State v. Montez*, 309 Or 564, 604, 789 P2d 1352 (1990) (refusing to consider defendant's constitutional argument because the issue was not adequately developed on appeal).

Before turning to the merits of plaintiff's federal claims, we briefly consider his assertion that the United States Supreme Court's recent decision in *National Railroad Passenger Corporation v. Morgan*, 536 US 101, 122 S Ct 2061, 153 L Ed 2d 106 (2002) (*AMTRAK*), requires a remand of those claims because, in ruling on defendant's motions, the trial court disregarded evidence that it was required to consider in light of that decision. In *AMTRAK*, the Court held that, if one act contributing to a claim for hostile work environment falls within the applicable limitations period, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.[5] That holding applies only to hostile work environment cases, not to claims arising from discrete acts, such as plaintiff's discriminatory discharge claim. *Id.* at 114-15. Because, as explained below, we reverse the directed verdict on plaintiff's hostile work environment claim on other

---

[5] Federal law requires an employee to file an administrative complaint within 300 days of the discriminatory act and then file an action within 90 days of the issuance of a "right to sue" letter. 42 USC § 2000e-5(e), (f).

grounds, we need not further consider plaintiff's argument based on *AMTRAK*.

Turning to the merits, plaintiff first assigns error to defendant's motion to strike the following two paragraphs from his complaint:

"12.

"[Plaintiff] was fired because of a false accusation made by a female employee. [Plaintiff] was not allowed to defend himself because of his race and because he had been labeled a trouble maker because of his resistance to racial discrimination. [Plaintiff] lost wages and benefits as a result of his termination in an amount not to exceed 100,000.00

"13.

"Other white employees had been accused of sexual discrimination and had not been terminated. [Plaintiff] was terminated because he was Hispanic."

On appeal, the parties have framed the claim embodied in those paragraphs as one for discriminatory discharge based on "disparate treatment." That type of claim is subject to the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 US 792, 802-05, 93 S Ct 1817, 36 L Ed 2d 668 (1973). *See Durham*, 181 Or App at 422-23 (setting forth federal analysis). Under that analysis, the plaintiff initially must establish a *prima facie* case of discrimination and, if he or she does so, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discharge, although the burden of persuasion "remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 US 248, 253, 101 S Ct 1089, 67 L Ed 2d 207 (1981). Finally, if the defendant provides such a reason, the presumption of discrimination "drops out of the picture," and the plaintiff must demonstrate that the employer's proffered reason is pretextual. *St. Mary's Honor Center v. Hicks*, 509 US 502, 511, 113 S Ct 2742, 125 L Ed 2d 407 (1993). In order to establish a *prima facie* case, plaintiff was required to offer evidence that "give[s] rise to an inference of unlawful discrimination." *Burdine*, 450 US at 253. That could be accomplished by the introduction of either direct or circumstantial evidence of a discriminatory motive

for his discharge. *Swierkiewicz v. Sorema N.A.*, 534 US 506, 511, 122 S Ct 992, 152 L Ed 2d 1 (2002).

■ Plaintiff did not present any direct evidence of a discriminatory motive for his discharge. This case does not involve management employees making racist remarks or the like. *See* Barbara Lindemann & Paul Grossman, 1 *Employment Discrimination Law*, 55 n 113 (Supp 2002) (listing cases where biased remarks by managers were held to constitute direct evidence). The question remains whether plaintiff adduced sufficient circumstantial evidence to establish a *prima facie* case of discriminatory discharge.

■ A *prima facie* case based on circumstantial evidence may consist of proof that (1) plaintiff is a member of a protected class, (2) plaintiff was qualified for the job and was performing it according to the employer's legitimate expectations, (3) plaintiff suffered an adverse employment action, and (4) other "similarly situated" nonminority employees were treated more favorably.[6] *McDonnell Douglas*, 411 US at 802; *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F3d 1054, 1062 (9th Cir 2002) (so stating in sex discrimination case). We conclude that plaintiff's evidence failed to satisfy the fourth element of that standard. Plaintiff relies on testimony by a coworker that no employee was ever disciplined for using racial slurs as establishing that he was "terminated for conduct in which white male workers regularly engaged without any repercussions." However, there was no evidence that it was "white male workers" who engaged in the conduct or that they were similarly situated to plaintiff. In short, plaintiff provided no specific evidence pertaining to similarly situated persons or how defendant treated them.

■ Moreover, even assuming that plaintiff established a *prima facie* case of discrimination, defendant articulated a legitimate, nondiscriminatory reason for plaintiff's discharge, namely, plaintiff's sexual harassment of coworkers. Accordingly, it was plaintiff's burden to demonstrate that

---

[6] The United States Supreme Court has emphasized that "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.' " *Swierkiewicz*, 534 US at 512 (citation omitted); *see also Durham*, 181 Or App at 423.

defendant's proffered reason for the discharge was pretextual. Plaintiff did not meet that burden. The evidence showed that Collins, a supervisor, spoke with plaintiff about McCauley's harassment complaint and then consulted Garr, the personnel manager. The evidence further showed that Garr considered McCauley's statements about the incident and Collins' report of plaintiff's denial, reviewed plaintiff's personnel file, consulted the plant manager, and then directed Collins to fire plaintiff. Even if the jury believed plaintiff's testimony that Collins' actions were motivated by the fact that he was dating McCauley, that evidence would permit only the inference that Collins acted because of jealousy, not because of plaintiff's race. Likewise, Garr's knowledge of the relationship between Collins and McCauley does not logically support the inference that his decision to direct Collins to fire plaintiff was racially motivated. The evidence showed that Garr believed coworker reports of sexual harassment, warned plaintiff verbally and in writing, and fired him upon determining that McCauley's complaint was credible.

Moreover, there was no evidence that defendant had labeled plaintiff as a troublemaker because of his complaints, or that there was any connection between those complaints and his discharge. Thus, even if the allegations of sexual harassment were false, plaintiff failed to demonstrate that it was his race, and not the allegations of sexual harassment, that motivated defendant's decision to discharge him. *See Elrod v. Sears, Roebuck and Co.*, 939 F2d 1466, 1470-71 (11th Cir 1991) (holding that, where the employer fired the plaintiff upon a good faith belief that he sexually harassed coworkers, the plaintiff could not prove pretext by challenging the harassment allegations). Plaintiff's subjective perception that he was fired for discriminatory reasons is insufficient to demonstrate a pretextual discharge. *See, e.g.*, *Villiarimo*, 281 F3d at 1062 ("Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial."). We therefore conclude that the trial court did not err in granting defendant's motion to strike paragraphs 12 and 13 of plaintiff's complaint and, ultimately, in dismissing plaintiff's discriminatory discharge claim.

In his second assignment of error, plaintiff challenges the trial court's grant of defendant's motion for a

directed verdict on his federal hostile work environment claim. That claim, like plaintiff's discriminatory discharge claim, falls within the ambit of 42 USC section 2000e-2(a) as discrimination in the "terms [and] conditions" of employment. For a hostile work environment claim to be actionable, the offensive environment must be "sufficiently severe or pervasive" so as to alter the conditions of the victim's employment and create an abusive working environment. *Meritor Savings Bank v. Vinson*, 477 US 57, 67, 106 S Ct 2399, 91 L Ed 2d 49 (1986).[7] " '[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* (quoting *Rogers v. EEOC*, 454 F2d 234, 238 (5th Cir 1971), *cert den*, 406 US 957 (1972)). The environment must be both objectively and subjectively offensive, "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. Boca Raton*, 524 US 775, 787, 118 S Ct 2275, 141 L Ed 2d 662 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 US 17, 21-22, 114 S Ct 367, 126 L Ed 2d 295 (1993)). Whether an environment is hostile or abusive can be determined only by considering "all the circumstances," which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 524 US at 23. Finally, there must be a basis for imposing liability on a defendant, which depends on whether the defendant knew or should have known that the conduct of the plaintiff's coworkers was unwelcome and whether the defendant promptly took appropriate corrective action. *Burlington Industries, Inc. v. Ellerth*, 524 US 742, 759, 118 S Ct 2257, 141 L Ed 2d 633 (1998).

---

[7] Although *Meritor* involved a sexual harassment claim, its principles are equally germane to racial harassment claims. *See Faragher v. Boca Raton*, 524 US 775, 786-87, 787 n 1, 118 S Ct 2275, 141 L Ed 2d 662 (1998) ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."); *Vasquez v. County of Los Angeles*, 307 F3d 884, 892 (9th Cir 2002) ("Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to our analysis.").

Here, defendant does not assert that plaintiff was not subjected to verbal or physical conduct of a harassing nature. Instead, defendant argues that "whatever [plaintiff's] subjective state of mind," the conduct was not unwelcome "in a way that was known or should have been known to 'higher management.'" Defendant reasons that, because plaintiff sometimes engaged in conduct similar to that which he claims was harassing, he welcomed such interactions and, therefore, did not subjectively perceive the environment to be hostile. In support, defendant emphasizes plaintiff's admission that he used terms such as "whitey" and "honkey," sometimes initiated the use of racial slurs, failed to indicate that he found the conduct offensive other than to merely "walk away," and admitted that some of his coworkers were not, at times, serious when they used racial slurs.

Despite those admissions, though, we cannot say that no reasonable juror could conclude that plaintiff found the conduct unwelcome. Plaintiff testified that such conduct "might have been a joke to them, but it was no joke to me," that it made him "mad, unhappy, sad" and that his in-kind responses were merely a means of defending himself. A jury could reasonably believe that testimony and find that, at least some of the time, plaintiff was offended by his coworkers' conduct. In that regard, this case is distinguishable from *Reed v. Shepard*, 939 F2d 484 (7th Cir 1991), and *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F3d 958 (8th Cir 1999), on which defendant relies. Although in those cases there was evidence that the plaintiffs had engaged in behavior that was similar to the conduct that they claimed was offensive, there also was evidence that their participation was usually, if not always, willing, that they initiated the conduct, and that they were not upset by it. *See Scusa*, 181 F3d at 966 (noting that the plaintiff admitted that she had yelled at other employees, used foul language, and teased other employees); *Reed*, 939 F2d at 487 (noting evidence that the plaintiff was put on probation for her use of offensive language, participated in suggestive behavior, and "reveled in the sexual horseplay"). The plaintiffs in those cases did not claim, as plaintiff does here, that their own offensive conduct was a coping mechanism for the harassment directed at them.[8] Based on the totality of the

---

[8] Although the plaintiff in *Reed* testified that she tolerated the activities of her fellow police officers without complaint because it was the "only way" she could be

circumstances, plaintiff's evidence was sufficient to support a reasonable inference of unwelcomeness.

We turn to the requirement that the offensive conduct be "sufficiently severe or pervasive" so as to alter the conditions of the victim's employment and create an abusive working environment. Plaintiff presented evidence that racial epithets were used by his coworkers daily on the shop floor and that other incidents, such as defacement of his property in a racially derogatory fashion, occurred several times during his five years of employment with defendant. That evidence demonstrates more than mere utterances, simple teasing, offhand comments, isolated incidents, or other "ordinary tribulations of the workplace." *Faragher*, 524 US at 788 (citation omitted). Rather, plaintiff presented evidence from which a jury reasonably could have inferred that the conduct was frequent, severe, interfered with his work, and fueled an altercation with a coworker that led plaintiff to take a leave of absence. That evidence was sufficient to create an inference that an abusive environment existed in the workplace. *See Harris*, 510 US at 23 ("whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances * * * no single factor is required").

■ Having concluded that plaintiff presented sufficient evidence of an abusive work environment that he did not welcome, we turn to the issue of whether there is a basis in the record for imposing liability on defendant. It is undisputed that this case involves coworker harassment. An employer is not liable for coworker, as opposed to supervisor, harassment unless it "knew or should have known" of the harassment and failed to take prompt and effective remedial steps. *Faragher*, 524 US at 799-800 (applying negligence standard to coworker harassment; citing 29 CFR § 1604.11(d) (1997)).

■ In both *Ellerth* and *Faragher*, the Court held:

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by

accepted and that one did not "snitch out" other officers, the court emphasized that other female employees testified that male employees did not behave crudely around women who asked them not to and that the showing that she welcomed the activity was "fatal to her claim, particularly where [she] admits that the 'harassment' did not adversely affect her ability to do her job." *Reed*, 989 F2d at 492.

a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence * * *. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any * * * harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Ellerth*, 524 US at 765; *see also Faragher*, 524 US at 807. Defendant argues that the affirmative defense available to employers in supervisor harassment cases also should be available in coworker harassment cases. Defendant acknowledges that the above-quoted discussion appears to confine the affirmative defense to supervisor harassment cases. *See Faragher*, 524 US at 803 ("When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position * * *, whereas an employee generally cannot check a supervisor's abusive conduct the same way that she might deal with abuse from a co-worker."). However, defendant nonetheless urges us to apply "at least [the] underlying reasoning" of the *Faragher/Ellerth* affirmative defense to this case.

We decline defendant's invitation. As the Ninth Circuit recognized in considering a similar argument,

"it is not clear under which rubric [vicarious liability or negligence] employers are 'better off' from an evidentiary and legal standpoint. It might reasonably be argued * * * that employers are 'better off' in the negligence context, where the plaintiff is required to prove both the employer's knowledge of the harassment (or that it should have known) and that it failed to take reasonable corrective action. In the strict liability context, the plaintiff is required to prove significantly less in the prima facie case: merely that the harasser was his supervisor."

*Swinton v. Potomac Corp.*, 270 F3d 794, 804 (9th Cir 2001), *cert den*, 535 US 1018 (2002). The court noted that, although

the *Faragher/Ellerth* defense is "not available as an affirmative defense" in cases of coworker harassment, "the principle embodied in the defense—that an employer can avoid liability in situations where it acts promptly to remedy harassment—is contained in the requirements for a prima facie case based on negligence." *Swinton*, 270 F3d at 803. As discussed, a plaintiff must establish that an employer knew or should have known of the harassment and failed to take reasonably prompt corrective action. *Id.*; *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F3d 864, 875 (9th Cir 2001). The sort of evidence that is relevant to the *Faragher/Ellerth* defense—evidence of an employer's complaint procedure or antiharassment policy and whether a plaintiff unreasonably failed to take advantage of such opportunities—necessarily will be relevant to establishing an employer's liability under a negligence standard. The only difference is that the plaintiff,. not the defendant, bears the burden with respect to such evidence. We now consider the sufficiency of the evidence on that issue here.

■ Although plaintiff's complaint had to be specific enough to apprise defendant that he was upset, plaintiff was not required to use magic words such as "racial harassment" in order to put defendant on notice that a hostile work environment existed. *See Nichols*, 256 F3d at 873 n 6 (concluding that the plaintiff was not required to use the term "sexual harassment"; it was sufficient that plaintiff "specified" the slurs and insults). We conclude that plaintiff presented sufficient evidence to support a reasonable inference that defendant knew or should have known that he was being racially harassed by coworkers and that it failed to promptly take appropriate corrective action. Plaintiff presented evidence that his supervisors sometimes were "standing right there" when racial comments were directed toward him by his coworkers. That evidence reasonably supported an inference that supervisors knew of the harassment and thus, that defendant is chargeable with that knowledge. *See, e.g., Swinton*, 270 F3d at 804 (finding employer liable where supervisor "witnessed the harassment but did nothing to end it"). Further, plaintiff testified that he told Jennings at the time of the November 20 incident that the racial atmosphere was a "bunch of bull S." Although plaintiff stated that he

"rushed out the door" after making the statement, he also testified that Jennings "smirked" in response to his complaint. With respect to his complaint to Caulkins in 1996 or 1997, plaintiff testified that he was discussing the "racial atmosphere" on the shop floor, including specific individuals, and that he told Caulkins that "This is a bunch of bullshit." Plaintiff admitted that Caulkins informed him of defendant's racial harassment policies and that Caulkins probably told him that he needed to file a formal complaint. However, plaintiff also testified that Caulkins told him "to learn to deal with it or—or ask for a transfer, or get another job." Plaintiff and other witnesses also stated that complaining was discouraged at their workplace and that "nothing would get done."

Although a jury could have disregarded plaintiff's evidence and believed other evidence tending to show that plaintiff's supervisors did not know that he was upset by the racial atmosphere, including evidence that plaintiff participated in the conduct and was friendly with some of the perpetrators, that defendant had antiharassment policies in place, and that plaintiff failed to utilize them, we cannot weigh the evidence in this setting. *See Bolt v. Influence, Inc.*, 333 Or 572, 577-78, 43 P3d 425 (2002). Because there is evidence that plaintiff was subjected to an unwelcome and abusive work environment based on race and that defendant knew or should have known about it but failed to take appropriate corrective action, the trial court erred in granting defendant's motion for a directed verdict on plaintiff's hostile work environment claim under federal law.

Judgment for federal hostile work environment claim reversed; otherwise affirmed.