Argued and submitted March 8, 2019, reversed and remanded July 29, petition for review denied October 22, 2020 (367 Or 217)

H. K.,
*Plaintiff-Respondent,*

*v.*

SPINE SURGERY CENTER OF EUGENE, LLC,
an Oregon limited liability company;
and Glenn Keiper, Jr., M. D.,
*Defendants-Appellants,*

*and*

KEIPERSPINE PC,
*Defendant.*

Lane County Circuit Court
15CV23413; A164453

470 P3d 403

Defendants Spine Surgery Center of Eugene, LLC, and its owner Glen Keiper appeal from a judgment against the clinic for sexual harassment, ORS 659A.029 and ORS 659A.030, and for intentional infliction of emotional distress and battery, arising out of Keiper's alleged sexual harassment of plaintiff, a former employee. Defendants assign error to the trial court's admission into evidence of documents related to a Bureau of Labor Industries (BOLI) investigation of a sexual harassment complaint against the clinic by another former employee. The trial court concluded that the evidence was relevant to the sexual harassment claim for the limited purpose of showing defendants' notice or knowledge of Keiper's harassment of plaintiff. *Held*: The evidence was not relevant to the claim of sexual harassment, which does not include an element of notice or knowledge when the person creating the hostile working environment is the employer or someone who stands in the employer's shoes, as was the case here. The trial court therefore erred in admitting the BOLI documents for that purpose. The error was not harmless.

Reversed and remanded.

Suzanne B. Chanti, Judge.

Hillary A. Taylor argued the cause for appellants. Also on the opening brief were Lindsey H. Hughes and Keating Jones Hughes, PC. Also on the reply brief was Keating Jones Hughes, PC.

Gregory Kafoury argued the cause for respondent. Also on the brief was Kafoury & McDougal.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

ARMSTRONG, P. J.

Reversed and remanded.

**ARMSTRONG, P. J.**

Plaintiff brought this action against her former employer, the Spine Surgery Center of Eugene, LLC, a surgery clinic (the clinic), and its owner Glenn Keiper, the clinic's medical director, arising out of Keiper's alleged sexual harassment of plaintiff. The amended complaint alleged a claim against the clinic of sexual harassment under ORS 659A.029 and ORS 659A.030, and claims against both the clinic and Keiper for intentional infliction of emotional distress and battery.[1] The claims were submitted to a jury, which reached a verdict for plaintiff and made a substantial award of damages. Defendants raise multiple assignments of error relating to the trial court's admission into evidence of documents from a file of the Bureau of Labor and Industries (BOLI) relating to an investigation of a sexual harassment complaint that had been filed with BOLI against the clinic by defendants' former employee, Jamie O'Bannon. We agree with defendants that the trial court erred in admitting the BOLI documents and that the error was not harmless. Accordingly, we reverse the judgment for plaintiff.

Plaintiff filed a complaint in September 2015 alleging that she had worked as a surgical technologist for defendants for approximately six years and that, during that time, Keiper had engaged in a pattern of sexual harassment toward plaintiff that included unwanted verbal harassment and physical contact and that had created a hostile work environment that had caused plaintiff to resign her employment.[2] The complaint alleged a claim of sexual harassment against the clinic, ORS 659A.029 and ORS 659A.030, and

---

[1] Defendant KeiperSpine P.C. was dismissed from the suit.

[2] The amended complaint alleged that Keiper's conduct "included, but was not limited to:

"(a)  Keiper requesting that plaintiff go home with him when his wife was not home so that they could have intercourse;

"(b)  Grabbing her buttocks and telling plaintiff that she had a 'tight ass';

"(c)  Telling plaintiff in front of a new hire that defendant and plaintiff have had 18 years of sexual tension and should just get down on the floor and take care of it;

"(d)  Putting his arms down plaintiff's gown sleeves and tickling her sides;

claims of intentional infliction of emotional distress and battery against both the clinic and Keiper. The complaint alleged that Keiper is the owner of the clinic and was acting as the clinic's agent. The complaint alleged that the clinic was aware of Keiper's conduct toward female employees that created a hostile working environment and that it failed to take remedial action.

In their answer, defendants admitted that plaintiff had worked at the clinic and had resigned but denied each substantive allegation. As an affirmative defense, defendants alleged that plaintiff had participated in sexual comments and innuendo and had failed to notify either Keiper or the clinic of the alleged sexual harassment.

Before trial, plaintiff filed a motion *in limine* seeking the admission of documents from the BOLI file, which related to a claim against the clinic by a former employee, Jamie O'Bannon, in 2010, alleging sexual harassment by Keiper. The BOLI documents consisted of O'Bannon's complaint, a written statement by O'Bannon submitted with the complaint, and a memorandum in the BOLI file that appears to be a preliminary "substantial evidence" determination. Plaintiff's counsel explained that he intended to use the BOLI documents to impeach Keiper's deposition testimony in response to questions about the BOLI complaint. Defendants filed a motion *in limine*, seeking to exclude the same BOLI documents as irrelevant hearsay.

At a hearing on the motions, plaintiff's counsel represented that he had no intention of trying a "case within a case" by establishing the truth of the O'Bannon allegations. Plaintiff's counsel explained that he was not planning to call O'Bannon as a witness, but that she was under subpoena and could testify if called by defendants. Defendants' counsel reasserted that the BOLI documents were not relevant to plaintiff's claims and that their use for impeachment of Keiper's deposition testimony would also be irrelevant, inadmissible, and unfairly prejudicial.

---

"(e) Asking plaintiff during surgery if she knew how to have multiple orgasms; and,

"(f) Asking plaintiff if she wanted to see his penis."

The trial court did not rule on the admissibility of the BOLI documents at the hearing. The court expressed the view that the BOLI documents were hearsay but speculated the they could be admissible for a non-hearsay purpose such as notice.[3] However, the court deferred ruling on the admissibility of the BOLI documents, explaining that it preferred first to see the context in which the evidence was offered.

At trial, plaintiff's counsel offered the BOLI documents through the testimony of O'Bannon. In a colloquy with the court, plaintiff's counsel said that he would offer O'Bannon's testimony and the documents not for the truth of the allegations or the substantial-evidence determination, but for the limited purpose of establishing defendants' "notice and knowledge." Defendants' counsel repeated his objection that evidence from the BOLI file was inadmissible as irrelevant hearsay.

The court ruled that the evidence, including the preliminary substantial-evidence determination, was relevant and admissible with respect to the sexual harassment claim for the limited purpose of establishing that defendants had notice of prior allegations of sexual harassment by Keiper. Plaintiff relied on the evidence extensively at trial.

On appeal, most of defendants' assignments of error are directed to the trial court's ruling on the admissibility of the BOLI documents. We agree with defendants that the trial court erred in determining that the evidence was relevant to plaintiff's claim of sexual harassment and admissible to show defendants' notice or knowledge of Keiper's conduct.

The relevance of the BOLI documents depends on what plaintiff was required to prove in order to establish her claim of sexual harassment. ORS 659A.030(1)(b) states that it is an unlawful employment practice "[f]or an employer, because of an individual's *** sex *** to discriminate against

---

[3] We have previously held that a BOLI substantial-evidence determination is hearsay and therefore is not admissible in a civil discrimination action for the purpose of establishing the truth of the determination. *Sleigh v. Jenny Craig Weight Loss Centres, Inc.*, 161 Or App 262, 984 P2d 891, *on recons*, 163 Or App 20, 998 P2d 916 (1999).

the individual in compensation or in terms, conditions or privileges of employment." Because ORS 659A.030 was modeled after Title VII of the federal Civil Rights Act of 1964, 42 USC § 2000E et seq., Oregon courts look to federal cases construing Title VII for guidance in construing ORS 659A.030. *Mains v. II Morrow, Inc.*, 128 Or App 625, 634, 877 P2d 88 (1994).

We explained in *Mains* that federal courts construing Title VII generally divide sexual harassment claims into two categories. *Id.* at 634. In a claim involving a "quid pro quo," the employer is liable if the employer links employment benefits to the acceptance or rejection of sexual favors. *Id.* at 635. In a claim involving a sexually "hostile environment," the employer is liable when the conduct "is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (citing *Meritor Savings Bank v. Vinson*, 477 US 57, 67, 106 S Ct 2399, 91 L Ed 2d 49 (1986). Plaintiff's claim is of the latter type.[4]

Under Title VII, federal courts apply a negligence theory of respondeat superior or vicarious liability to hold

---

[4] BOLI has adopted the same general description of the types of claims by administrative rule, OAR 839-005-0030:

"(1) Sexual harassment is unlawful discrimination on the basis of sex and includes the following types of conduct:

"(a) Unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature when such conduct is directed toward an individual because of that individual's sex and:

"(A) Submission to such conduct is made either explicitly or implicitly a term or condition of employment; or

"(B) Submission to or rejection of such conduct is used as the basis for employment decisions affecting that individual.

"(b) Any unwelcome verbal or physical conduct that is sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with work performance or creating a hostile, intimidating or offensive working environment.

"(2) The standard for determining whether harassment based on an individual's sex is sufficiently severe or pervasive to create a hostile, intimidating or offensive working environment is whether a reasonable person in the circumstances of the complaining individual would so perceive it.

"(3) Employer proxy: An employer is liable for harassment when the harasser's rank is sufficiently high that the harasser is the employer's proxy, for example, the respondent's president, owner, partner or corporate officer."

an employer liable for a *coworker's* behavior creating a hostile working environment. The employer will be subject to liability when the employer "knew or should have known of the harassment and failed to take prompt remedial action against the supervisor." *Steele v. Offshore Shipbuilding, Inc.*, 867 F2d 1311, 1316 (11th Cir), *reh'g denied*, 874 F2d 821 (1989). In those cases, the plaintiff has the burden to establish that the employer knew or should have known of the harassment but failed to take prompt remedial action. *See Faragher v. City of Boca Raton*, 524 US 775, 790, 118 S Ct 2275, 141 L Ed 2d 662 (1998) (citing *Katz v. Dole*, 709 F2d 251, 255 (4th Cir 1983) ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior, the plaintiff will have the additional responsibility of demonstrating the propriety of holding the employer liable under some theory of respondeat superior.")); *Garcez v. Freightliner Corp.*, 188 Or App 397, 410, 72 P3d 78 (2003) (applying "knew or should have known" negligence standard to hold employer responsible for harassment by a coworker under Title VII).

We have applied that same negligence standard under ORS 659A.030.[5] *See Harris v. Pameco Corp.* 170 Or App 164, 178, 12 P3d 524 (2000) (an employer who has

---

[5] By administrative rule, OAR 839-005-0030, BOLI has adopted a negligence standard of liability similar to the federal standard:

"(5) Harassment by Supervisor, No Tangible Employment Action: When sexual harassment by a supervisor with immediate or successively higher authority over an individual is found to have occurred, but no tangible employment action was taken, the employer is liable if:

"(a) The employer knew of the harassment, unless the employer took immediate and appropriate corrective action.

"(b) The employer should have known of the harassment. The division will find that the employer should have known of the harassment unless the employer can demonstrate:

"(A) That the employer exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and

"(B) That the aggrieved person unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.

"(6) Harassment by Co-Workers or Agents: An employer is liable for sexual harassment by the employer's employees or agents who do not have immediate or successively higher authority over the aggrieved person when the employer knew or should have known of the conduct, unless the employer took immediate and appropriate corrective action."

notice or knowledge of harassing behavior by the plaintiff's coworker and takes immediate remedial action is not subject to liability under ORS 659A.030); *Mains*, 128 Or App at 634. In *Mains*, the trial court dismissed on summary judgment the plaintiff's sexual harassment claim alleging the creation of a hostile working environment by her supervisor. On appeal, we turned to federal caselaw for guidance on the standard of proof to establish an employer's liability for a supervisor's conduct in creating a hostile working environment and applied the negligence respondeat superior standard set forth in *Steele*. *Id.* at 635. In evaluating whether the evidence in the record on summary judgment created a genuine issue of material fact concerning the employer's liability, we cited evidence that, after a previous BOLI complaint and investigation of a claim of sexual harassment by the same supervisor, the employer had been required by BOLI to place a warning in the supervisor's personnel file. We concluded, based in part on that evidence, that the record gave rise to a genuine issue of material fact as to whether "management-level employees of defendant had reason to know of [the supervisor's] conduct and condoned it" and "whether the corrective action that defendant took was sufficiently 'prompt.'" *Id.*

It is likely that the trial court had that caselaw in mind when it reasoned that the BOLI evidence was admissible here for "notice and knowledge."[6] But the trial court was mistaken. The circumstances of this case are different from those in which a negligence standard has been applied to determine the employer's liability. Under Title VII, the burden to prove an employer's knowledge or notice of the behavior creating a hostile working environment arises when the conduct is by a person other than the employer or a supervisor of sufficiently high rank to qualify as an employer's proxy. *See Katz*, 709 F2d at 255 ("Except in situations where a proprietor, partner or corporate officer participates personally in the harassing behavior, the plaintiff will have

---

[6] In making its ruling, the trial court referred to BOLI's administrative rule, OAR 839-005-0030, which, as noted, 305 Or App at 612 n 5, essentially adopts the federal negligence standard in the context of a claim involving the conduct of a coworker or supervisor other than the employer. The rule also provides for the employer's direct liability when the conduct is by a person who is, as alleged here, the employer's "proxy."

the additional responsibility of demonstrating the propriety of holding the employer liable under some theory of respondeat superior."); *Garcez*, 188 Or App at 410 (stating that "[a]n employer is not liable for coworker, as opposed to supervisor, harassment unless it 'knew or should have known' of the harassment and failed to take prompt and effective remedial steps"). The requirement to show notice or knowledge of the employer does not apply when the person creating the hostile working environment is the employer itself or someone who stands in the employer's shoes. In such cases, the employer is directly liable. *Sparks v. Pilot Freight Carriers, Inc.*, 830 F2d 1554, 1557 (11th Cir 1987) (where the harasser is plaintiff's "employer," respondeat superior theory does not apply and plaintiff need not establish that she gave anyone notice of the harassment, because an employer is directly liable for its own sexual harassment of an employee); *see Faragher* 524 US at 790 (when a supervisor makes such decisions, he "merges" with the employer, and his act becomes that of the employer).

We conclude that the same rule should apply under ORS 659A.030. The burden to prove the employer's notice or knowledge does not arise when the hostile working environment has been created by the employer or a person who stands in the employer's shoes. When the actor is the employer him- or herself, the employer's liability is direct, and there is no burden to separately prove the employer's knowledge. *Schram v. Albertson's, Inc.*, 146 Or App 415, 934 P2d 483 (1997), *rev dismissed*, 328 Or 366 (1999) (for purposes of discrimination by an "employer" under ORS 659A.030, the act of an agent, who acts within his or her scope of authority in a discriminatory fashion, constitutes an act of the employer); *see also Mains*, 128 Or App at 635 (applying knowledge requirement to supervisor who was not management level). Here, plaintiff's claim was not based on the conduct of a coworker or a supervisor who acted without the authority of the employer, but on the conduct of Keiper, who, for purposes of ORS 659A.030, was the employer. *See* ORS 659A.001(4)(a) (defining "employer" for purposes of ORS chapter 659 as "any person who in this state, directly or through an agent, engages or uses the personal service of one or more employees, reserving the right to control the means by which such

service is or will be performed."); OAR 839-005-0030(3) ("An employer is liable for harassment when the harasser's rank is sufficiently high that the harasser is the employer's proxy, for example, the respondent's president, owner, partner or corporate officer."). The clinic's liability, if any, would derive directly from Keiper's conduct. There was no need to show that the clinic had notice or knowledge of Keiper's conduct, and defendants' notice or knowledge was not a factual issue for the jury to decide. Thus, assuming, without deciding, that evidence of a complaint by a third party *could* establish the necessary notice of a hostile working environment, the evidence was not relevant here, because plaintiff's claim was against the employer directly, and she therefore did not have a burden to show notice or knowledge. The trial court therefore erred in admitting the evidence for that purpose.

The trial court's erroneous ruling was not harmless. Plaintiff relied extensively on the evidence, which was highly incriminating. Through O'Bannon's testimony, the court received into evidence O'Bannon's BOLI complaint, her written statement submitted with the complaint, and the BOLI memorandum.[7] The court allowed plaintiff's counsel to project O'Bannon's written statement on a screen for the jury and allowed O'Bannon to read it aloud.[8] The court

---

[7] Because the trial court admitted O'Bannon's testimony describing the documents only for the purpose of notice, the court did not allow defendants to cross-examine her about the content of the complaint. Defendants have assigned that ruling as error, but, because of our disposition, we need not address it.

[8] O'Bannon read from the statement she submitted with her BOLI complaint:

"Dr. Glenn Keiper made sexual comments on almost a daily basis. They started out as minor comments about my looks or my body. I basically blew them off and was reassured that nothing was meant by them.

"It wasn't until about the last year I worked there that these comments got extremely bad. I heard sexual comments every day he was in the office. When he would call from the hospital he would do it over the phone. I was his medical assistant so continuous communication was part of my job.

"He would slap my butt while walking past me down the hall, which a couple patients had actually seen.

"He would try to put his hands down my pants whenever we were alone. No matter what I did, he would make something sexual out of it.

"When he would bring patients out to my desk to be scheduled he would reach out and run his hands up my arms, make sexual faces while he waited for the patient to get to my desk.

allowed plaintiff's counsel to give a copy of the substantial-evidence memorandum to the jury.[9]

The trial court allowed plaintiff's counsel to question Keiper concerning his memory of the O'Bannon complaint. Plaintiff's counsel read the O'Bannon statement to Keiper in the presence of the jury and interjected comments and questions, asking Keiper if he remembered each allegation, if the allegations made him angry or disturbed him, if he took the allegations to heart, if there was something about pulling a woman's hair that he found stimulating, and if he "knew that people go to jail for that sort of thing."

---

"He told me that he wanted me since I was 16 years old.

"My mom was his medical assistant for 12 years before I took that job. He would tell me to work late so that we could be alone after everyone had left.

"He told me that if I ever told anyone about this it would not only ruin his life, but it would ruin mine. He informed me that he would make it so that I could never find another job again. This is one of the reasons why I've taken so long in deciding whether or not to pursue this. But after almost a year of thinking about it and not being able to get another job, I feel it's the right thing to do.

"I don't think he should be able to get away with this or, even worse, do it to somebody else. I was made to feel that working in his office in silence was my only option.

"The types of comments that he started making on a regular basis are as follows: You need to be in my office with your clothes off when I get there tomorrow morning.

"You need to stop wearing a bra and underwear under your scrubs.

"When I'm in Vegas for my next conference you should come and we can meet up for some playtime. Jess will never know. Jess being his wife.

"He got behind me, and while he's pulling my hair, he said, I want to do you from behind and break your pelvis. Let's go in the bathroom and I can bend you over the sink.

"When you buy your house I can come over there and we can break in the new room."

[9] The memorandum, received by the court as Exhibit 25, stated, in relevant part:

"There is substantial evidence that Complainant was subject to a hostile work environment based on her sex. The weight of the evidence indicates that Dr. Keiper's verbal and physical conduct was unwelcome[ and was] directed at Complainant because of her sex. There is substantial evidence that Dr. Keiper did aid, abet, incite and compel acts prohibited under ORS 659A.030. This conduct was frequent, pervasive, and had the purpose or effect of creating an intimidating, hostile, and offensive working environment for Complainant as well as other employees. Complainant's allegations of improper sexual remarks and physical contact by Dr. Keiper are credible and supported by both direct and circumstantial evidence."

During closing argument, plaintiff's counsel again brought up the substantial-evidence memorandum:

> "Now, what exactly did Ms. O'Bannon accuse Dr. Keiper of doing? We want to look at what he was accused of doing. We're going to look at what BOLI investigators, independent investigators, after interviewing witnesses—what conclusion they came to[.]"

And again:

> "Can we go to the findings? BOLI did an investigation. They interviewed witnesses. They are a state agency. They're independent. They're not being paid by some prestigious law firm to investigate this."

The trial court's repeated warning to plaintiff's counsel that the evidence was only admitted for the purpose of notice did not dissuade counsel from arguing indirectly the truth of the findings stated in the BOLI memorandum and, in even the last moments of closing argument, referring to O'Bannon's complaint for the jury to contemplate as it retired to deliberate.[10] The trial court itself found that plaintiff had used the documents as proof of their contents and in support of the substance of plaintiff's claims. There can be no doubt that the BOLI documents could have been considered by the jury in its deliberation, either for purposes of notice or knowledge, for which the documents were improperly admitted, or as to the truth of plaintiff's allegations. We conclude for those reasons that the trial court's error was not harmless. In view of our disposition, we need not address defendants' remaining assignments of error.

Reversed and remanded.

---

[10] Plaintiff's counsel argued:

"Last word, your Honor. Remember what Ms. O'Bannon said in her summary complaint? She said, 'I waited a year because I didn't think he should be able to get away with this. Or worse, do it to anybody else.'

"Did any witness on [defendants'] side show half the humanity that * * * Ms. O'Bannon did?

"[Defense counsel]: Your Honor, I'm going to object again.

"[Plaintiff's counsel]: Don't you wish they did?

"[Defense counsel]: This is, again, a complete misuse of that evidence based upon the Court's rulings.

"THE COURT: Members of the jury, I will emphasize again that the evidence regarding the prior claim was offered and received for the purposes of notice."