680 S.E.2d 371

Sue J. ERPS and William G. Erps, d/b/a Improvements Unlimited, Appellants,

v.

WEST VIRGINIA HUMAN RIGHTS COMMISSION and Victor T. Peoples, Appellees.

No. 34262.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 2009.

Decided June 22, 2009.

Anthony R. Veneri, Veneri Law Offices, Princeton, WV, for Appellants.

Paul R. Sheridan, Deputy Attorney General, Civil Rights Division, Charleston, WV, for Appellee.

BENJAMIN, Chief Justice.

The instant matter comes before this Court upon direct appeal, pursuant to the provisions of W.Va.Code § 5–11–11(a) (1989), from an order entered by the West Virginia Human Rights Commission (hereinafter the "Commission") finding the appellants Sue J. Erps and William G. Erps, d/b/a Improvements Unlimited were liable to appellee Victor Peoples for claims of hostile work environment and retaliatory discharge arising from a June 16, 2004, workplace incident. The Commission's January 30, 2008, order affirmed and adopted as its own two orders entered by the Chief Administrative Law Judge in this matter after a full evidentiary

hearing. The Chief Administrative Law Judge's April 6, 2007, order addressed the liability issues, found that the imposition of monetary damages was appropriate and ordered certain injunctive and remedial actions. In an August 29, 2007, supplemental order, the Chief Administrative Law Judge directed the appellants to pay a total of $32,898.81 in damages, consisting of $24,085.30 in lost wages, $3,813.51 in interest and $5,000.00 in incidental damages for humiliation, embarrassment and loss of personal dignity, plus costs. After a thorough review of the record herein, we affirm, in part, and reverse, in part, the Commission's January 30, 2008, order.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellee, Victor Peoples (hereinafter "Mr. Peoples"), is an African–American male who began employment with Improvements Unlimited on April 13, 2004.[1] Improvements Unlimited is a proprietorship owned and operated by appellee William Erps (hereinafter "Mr. Erps") and his wife, appellee Sue Erps (hereinafter "Mrs. Erps"), and located in Princeton, West Virginia. On June 16, 2004, Mr. Peoples was a member of an Improvements Unlimited crew led by supervisor David Yontz (hereinafter "Mr. Yontz") building a tie wall at a business college in Bluefield, Tazewell County, Virginia. Additional crew members included Wayne Bragg (hereinafter "Mr. Bragg") and Jason Harris (hereinafter "Mr. Harris"). All crew members, except Mr. Peoples, were white as are Mr. and Mrs. Erps. That morning an altercation occurred between Mr. Peoples and Mr. Bragg which is at the heart of the instant dispute.

On the morning of Wednesday June 16, 2004, the Improvements Unlimited crew working on the business college's tie wall met at company headquarters in Princeton, West Virginia, and drove to the job site. The area where the tie wall was being constructed was approximately 45–50 feet in length and the

---

1. Unless otherwise noted, facts recited herein correspond to the findings of fact made by the Chief Administrative Law Judge and set forth in her orders.

crew worked within that area. Mr. Yontz and Mr. Bragg were drilling holes[2] while Mr. Peoples and Mr. Harris followed fitting rebar into the holes with sledgehammers. Although there had been no prior tension, arguments or problems between Mr. Peoples and Mr. Bragg, Mr. Peoples picked on Mr. Bragg that morning, calling him names such as "white trash" and "honky." According to Mr. Bragg, the racially-charged name calling angered him. Mr. Peoples continued his goading of Mr. Bragg by making fun of the way he talked.[3] This made Mr. Bragg angry. At some point, Mr. Peoples asked Mr. Bragg to drill the holes deeper because he was having difficulty fitting the rebar into the holes and Mr. Bragg responded by saying, "You say another word I'll cut your f* * *ing head off with this shovel, n* * * * *."[4] The men then approached Mr. Yontz about the situation. Not having heard the exchange[5] and realizing both men were upset and angry, Mr. Yontz feared the situation could escalate and that there might be a physical altercation. Therefore, he ordered them back to work in separate locations.[6]

Mr. Peoples was not satisfied with Mr. Yontz' response and continued to ask him what he was going to do about Mr. Bragg's comment. Instead of responding to Mr. Peoples' question, Mr. Yontz replied "That's done, over, get back to work." When Mr. Peoples persisted in his demand for immediate action, Mr. Yontz told him to get back to work or he was fired. Mr. Peoples respond-

ed by telling Mr. Yontz to send him home. Again, Mr. Yontz directed Mr. Peoples to return to work. Mr. Peoples would not go back to work, handed Mr. Yontz his sledgehammer and told him "to do what he had to do." Mr. Yontz responded by telling Mr. Peoples he was fired.

Thereafter, Mr. Peoples left the job site and apparently walked approximately eight to ten miles to his home because he had driven to the job site with Mr. Yontz. Upon arriving at home, Mr. Peoples called Mr. Erps on his cell phone to tell him about the incident. Mr. Erps responded that Mr. Bragg should not have called him the "n" word and that Mr. Erps would handle the situation.[7] That evening, Mr. Erps took statements from Mr. Yontz and Mr. Harris after he saw them at church.[8] Mr. Erps also spoke with Mr. Bragg about not using the "n" word, but took no further disciplinary action.

Mr. Peoples went to the Improvements Unlimited office on Friday, June 18, 2004, to pick up his paycheck.[9] Although Mr. Erps asked Mr. Peoples to stay until after pay checks were distributed, Mr. Peoples left and did not speak with Mr. Erps about the incident. Mr. Peoples returned to the Improvements Unlimited office on Friday June 25, 2004, to pick up his final paycheck. Again, Mr. Erps asked him to stay and talk about the incident with Mr. Bragg and, again, Mr. Peoples left before Mr. Erps could speak to him. Other than asking Mr. Peoples to stay and discuss the incident when paychecks

2. When not drilling holes, Mr. Yontz was operating a bobcat or "skid-steerer" to move materials.

3. It appears from the record created at the administrative hearing that Mr. Bragg has speech difficulties, although Mr. Peoples denied Mr. Bragg has any such difficulties.

4. During the administrative hearing, Mr. Bragg admitted that he made a racial slur to Mr. Peoples and that he threatened him with physical bodily harm with a shovel.

5. Mr. Yontz was drilling at the time.

6. It appears from the testimony during the administrative hearing herein that the incident between Mr. Peoples and Mr. Bragg occurred prior to the lunch hour.

7. Mr. Erps testified that he had also instructed Mr. Peoples to return to work the following day.

8. It appears from the testimony at the administrative hearing that Mr. Yontz and Mr. Harris dictated statements to Mrs. Erps. Mrs. Erps typed the statements before they were signed and dated by the men. While the testimony conflicted as to who and when a statement was taken from Mr. Bragg, the Chief Administrative Law Judge found in the April 6, 2007, order that "Mr. Yontz took Mr. Bragg's statement in 2006. Mr. Bragg cannot read or write. Mr. Yontz prepared Mr. Bragg's statement. Mr. Yontz read the statement to Mr. Bragg before he signed it."

9. Improvements Unlimited employees were paid each Friday morning, one week after the work week in which the pay was earned.

were distributed, there is no evidence in the record that Mr. Erps ever attempted to contact Mr. Peoples at home or by letter to discuss the June 16, 2004, incident with Mr. Bragg.

Mr. Peoples called the West Virginia Human Rights Commission on June 23, 2004, and requested a form to file a discrimination complaint.[10] His complaint was filed on July 2, 2004. Subsequent to filing his complaint, Mr. Peoples felt that Mr. Erps and employees of Improvements Unlimited were following and chasing him. He also stated that Brain Eaves, an African American employee of Improvements Unlimited, offered him money on behalf of Mr. Erps to drop his complaint. He also testified that Claude Erps' workers attempted to intimidate him.[11]

After receiving a response to Mr. Peoples' complaint from Mr. Erps, the Human Rights Commission made a probable cause finding and the matter proceeded in litigation.[12] An administrative hearing was held in this matter on December 5–6, 2006, in Princeton, Mercer County, West Virginia. On April 6, 2007, an order was entered finding the Erps and Improvements Unlimited liable for fostering a hostile work environment, retaliatory discharge for engaging in a protected activity, i.e., complaining about Mr. Braggs'

comment which was characterized in the order as sufficiently severe to constitute racial harassment, and retaliation for filing a complaint with the Commission. The Order granted a cease and desist instruction aimed at preventing further discriminatory practices and directed the Erps to institute a harassment policy and reporting procedure to be distributed to all employees and undergo one hour of anti-harassment training together with their supervisory personnel. In addition to requiring the Erps to pay the Commission's costs in the amount of $1,854.06, the order awarded Mr. Peoples incidental damages in the maximum statutory amount of $5,000.00 and found that lost wages should be awarded, plus statutory interest, from the date of Mr. Peoples' termination until such time as Mr. Peoples was no longer physically able to perform a laborer job such as the one he performed at Improvements Unlimited.

Mr. Peoples' hearing testimony revealed that he had begun receiving partial disability benefits from the Veteran's Administration in August 2004 and had applied for total disability benefits at some point, no later than January 2006, although the exact date he became unable to work was unclear from the record.[13] The April 6, 2007, order directed

10. During the administrative hearing, Mr. Peoples was adamant in his testimony that the events in question occurred on June 23, 2004, the same day he filed his complaint with the Human Rights Commission. The documentary evidence, however, contradicted Mr. Peoples' account as demonstrated by the findings and conclusions set forth in the April 6, 2007, order. While not explicitly stating so, it is obvious from the findings of fact set forth in the April 6, 2007, order, that Mr. Peoples' version of events was not deemed credible by the Chief Administrative Law Judge. According to Mr. Peoples' version of the events which he believes occurred on June 23, 2004, he reported to work that morning at the Improvements Unlimited office in Princeton, drove to the job site with Mr. Yontz and his fellow crew members, worked up until the time of the confrontation with Mr. Bragg without saying anything derogatory to Mr. Bragg, walked eight to ten miles home, called Mr. Erps, called the Human Rights Commission, filed his complaint, walked to another business to apply for a job and witnessed an automobile accident involving one of the other Improvements Unlimited crew leaders, although he could not recall his name. The April 6, 2007, order also found,

contrary to Mr. Peoples' testimony, that he signed his complaint on July 2, 2004.

11. The hearing transcript reveals that Claude Erps is Mr. Erps' brother and owns a company separate and distinct from Improvements Unlimited.

12. It appears from the record before this Court that Mr. Erps initially responded to the complaint and subsequent discovery *pro se* on behalf of himself, his wife and Improvements Unlimited. Counsel did not appear until August 2005.

13. Between the conclusion of the hearing on December 6, 2006, and entry of the April 6, 2007, letter, Mr. Peoples wrote several *ex parte* letters to the Chief Administrative Law Judge. The first, dated January 19, 2007, disputed a portion of the hearing transcript indicating that he did not testify in that manner recorded and indicated that he needed "to get pay from 6–23–04 to 1–1–06." A second, undated letter stamped received at the Human Rights Commission on January 26, 2007, indicated that Mr. Peoples had signed up for social security disability and "with the VA." In that letter, he stated

the Human Rights Commission and Mr. Peoples to determine the exact date that Mr. Peoples was rendered unable to work with documentary evidence, if possible, and submit final calculations regarding back pay by April 20, 2007, with a final decision to be issued by May 30, 2007, after consideration of responses and replies to the calculations. It appears from the record before this Court that Mr. Peoples did not cooperate with obtaining records concerning his disability claims, refusing to sign a release and further refusing to cooperate with the assistant attorney general handling his claim, as evidenced by May 21, 2007, and June 1, 2007, letters from counsel to the Chief Administrative Law Judge. As a result, the Chief Administrative Law Judge entered an order on May 23, 2007, directing Mr. Peoples to sign a records release authorization on or before June 4, 2007. On May 24, 2007, the Chief Administrative Law Judge entered a second order reiterating the directive contained in the May 23, 2007, order and indicating that "[f]ailure of the Commission and Mr. Victor Peoples to provide the requested calculations regarding back pay will result in adverse inferences and the issuance of a Supplemental Final Decision that does not include a back pay award." By letter dated July 2, 2007, a deputy attorney general handling Mr. Peoples' claim informed the Chief Administrative Law Judge that Mr. Peoples had indicated he would not sign the release and that counsel would submit a back pay calculation based upon the information available at that time.

On August 29, 2007, the Chief Administrative Law entered a Supplemental Final Decision on Damages. That order contained additional findings of fact that Mr. Peoples was unlawfully terminated from his employment because of racial discrimination on June 16, 2004 and was entitled to back pay for the period from June 16, 2004 to December 2005. Findings of fact were made that Mr. Peoples had been uncooperative with the Commission's attorneys in their efforts to determine the onset date of his total disability. Finding that Mr. Peoples had suffered an aneurism in January 2006 and has not been able to work, the Chief Administrative Law Judge found Mr. Peoples was not entitled to back pay after December 2005.[14] Based upon the findings made in both the April 6, 2007, order and the August 29, 2007, order, the August 29, 2007, order granted Mr. Peoples $24,085.30 in lost wages, in addition to $3,813.51 in interest upon the same, and reiterated that he was entitled to the statutory maximum $5,000.00 in incidental damages. Upon appeal to the Human Rights Commission, the Chief Administrative Law Judge's decisions were affirmed and adopted in their entirety. Appellants thereafter sought a direct appeal to this Court pursuant to the provisions of W. Va.Code § 5–11–11(a) (1989). Upon consideration of the record created below, the parties' briefs and oral arguments and the pertinent legal authori-

that he "was unemployed, broke and without funds so I went and signed up for income. Waiting on the settlement from the above case."

14. After the conclusion of the hearing Mr. Peoples submitted the first page of a December 28, 2005, decision by the Veterans Administration directly to the Chief Administrative Judge. The August 29, 2007, order cites this document in finding that "[c]learly Mr. Peoples' partial disability is based on chronic fatigue syndrome" and that he was not totally disabled nor unemployable as a laborer on that date. Other than claim identifying information, the entire text of the unauthenticated document in the record which was relied upon by the Chief Administrative Law Judge in making the disability determination states:

**INTRODUCTION**

The records reflect that you are a veteran of the Peacetime and Gulf War Era. You served in the Army from April 10, 1986 to August 1, 1986, from April 22, 1987 to April 20, 1990 and from January 31, 1991 to April 25, 1991. You filed a claim for increased evaluation that was received on March 30, 2005. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

**DECISION**

1. Evaluation of chronic fatigue syndrome (claimed as a sleep disorder), which is currently 10 percent disabling, is continued.
2. Service connection for gastrointestinal condition and diarrhea is denied.
3. Entitlement to individual unemployability is denied.

There is no indication in the record as to what was contained in the remainder of this document which was not submitted by Mr. Peoples for consideration in this litigation.

ties, we affirm, in part, and reverse, in part, the Commission's decision.

## II.

## STANDARD OF REVIEW

 In syllabus point 1 of *Cobb v. West Virginia Human Rights Commission*, 217 W.Va. 761, 619 S.E.2d 274 (2005), this Court held:

> Where an appeal from an order issued by the West Virginia Human Rights Commission is brought directly to the West Virginia Supreme Court of Appeals, pursuant to W.Va.Code § 5–11–11 (1989), this Court will apply the same standard of review that is applied to Human Rights Commission orders appealed to a circuit court.

Accordingly, this Court is bound by the statutory standards contained in W.Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong. Syl. pt. 1, in part, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). We have further stated that West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties. Syllabus Point 1, *West Virginia Human Rights Comm'n v. United Transp. Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981). Syl. pt. 2, *Smith v. West Virginia Human Rights Commission*, 216 W.Va. 2, 602 S.E.2d 445 (2004). Likewise, this Court conducts its review of the Commission's orders in accordance with the provisions of W.Va.Code § 29A–5–4(g) (1998). Syl. pt. 3, *Smith v. West Virginia Human Rights Comm'n*, 216 W.Va. 2, 602 S.E.2d 445 (2004) (quoting, Syl. pt. 2, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983)). Utilizing these standards as a guide, we proceed to the issue presented herein.

## III.

## DISCUSSION

Before this Court, appellants assert five assignments of error challenging the calculation of back pay, the findings of retaliatory discharge, hostile work environment, and retaliation for filing a complaint and the amount of the incidental damages award. As any discussion of damages will be dependent upon our analysis of the substantive claims, we first address the substantive liability findings.

### A.

### *Hostile Work Environment*

 Appellants argue that the single incident with Mr. Bragg which triggered the events at issue herein was insufficient to constitute a finding of a hostile work environment under our law. Appellees counter by arguing that a significant accumulation of incidents is not always required to support a finding of a racial hostile work environment and that Mr. Bragg's comment was sufficiently severe to uphold the hostile work environment finding. After consideration of the entire record herein, we agree with the appellants that, in this specific case, the Commission erred in imposing liability for a racially hostile work environment.

 In syllabus point 2 of *Fairmont Specialty Services v. West Virginia Human Rights Commission*, 206 W.Va. 86, 522 S.E.2d 180 (1999), this Court set forth the standard for establishing a claim for a racially hostile work environment under the West Virginia Human Rights Act, W.Va.Code §§ 55–11–1 to –20 (1999). Therein we held:

> To establish a claim for ancestral discrimination, under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20 (1999) based upon a hostile or abusive work environment, a plaintiff-employee must prove that: (1) that the subject conduct was unwelcome; (2) it was based on the ancestry of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment; and (4) it was imputable on some factual basis to the employer.

Syl. pt. 2, *Fairmont Specialty*, 206 W.Va. 86, 522 S.E.2d 180. Although this Court previously noted that "[i]n order to constitute harassment, [the] conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive[,]" *Conrad v. Szabo*, 198 W.Va. 362, 372, 480 S.E.2d 801, 811 (1996)(quoting *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir.1982)), we have not heretofore addressed this first element of a hostile work environment claim, *i.e*, that the subject conduct was unwelcome, in detail. In light of the Commission's findings relative to Mr. Peoples' actions precipitating Mr. Bragg's comments on June 16, 2004, we find it necessary to address this element of a hostile work environment claim further.

The law surrounding hostile work environment claims has become fairly well developed over the years, with similar standards being adopted and applied in both federal and state courts. In *Garcez v. Freightliner Corporation*, 188 Or.App. 397, 72 P.3d 78 (2003), the Oregon Court of Appeals outlined the standards applicable to a claim arising from a racially hostile work environment under federal law in the context of a motion for directed verdict. In *Garcez*, the Oregon court noted:

> For a hostile work environment claim to be actionable, the offensive environment must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and create an abusive working environment. *Meritor Savings Bank, v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). [M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII. *Id*. (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. den.*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). The environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so. *Faragher v. Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citing *Harris v.*

*Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Whether an environment is hostile or abusive can be determined only by considering all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295. Finally, there must be a basis for imposing liability on a defendant, which depends on whether the defendant knew or should have known that the conduct of the plaintiff's coworkers was unwelcome and whether the defendant promptly took appropriate corrective action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

*Garcez*, 72 P.3d at 85–86 (footnote omitted). The court, in *Garcez*, recognized that much of the law in this area has developed in the context of sexual harassment claims, but noted that the governing principles are "equally germane" to both sexual and racial harassment claims. *Id*. at 86 n. 7 ("Although *Meritor* involved a sexual harassment claim, its principles are equally germane to racial harassment claims. *See Faragher v. Boca Raton*, 524 U.S. 775, 786–87, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.); *Vasquez v. County of Los Angeles*, 307 F.3d 884, 892 (9th Cir.2002) (Because the elements to prove a hostile work environment are the same for both racial harassment and sexual harassment, cases analyzing both types of harassment are relevant to our analysis.)."). Thus, the standards are similar regardless of the nature of the alleged harassment.

In discussing the "welcomeness" aspect of a hostile work environment claim, the Eighth Circuit Court of Appeals found that:

> the conduct at issue must be unwelcome in that the plaintiff neither solicited it nor

invited it and regarded the conduct as undesirable or offensive. *See Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)(*Meritor*); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 962 (8th Cir.1993); *Hall v. Gus Const. Co.*, 842 F.2d 1010, 1014 (8th Cir. 1988). The proper inquiry is whether [appellant] indicated by [her] conduct that the alleged harassment was unwelcome. *Quick [v. Donaldson]*, 90 F.3d [1372,] 1378 [(8th Cir.1996)], *citing Meritor*, 477 U.S. at 68, 106 S.Ct. 2399, 91 L.Ed.2d 49.

*Scusa v. Nestle U.S.A. Company, Inc.*, 181 F.3d 958, 966 (8th Cir.1999). *See also, Beach v. Yellow Freight System*, 312 F.3d 391 (8th Cir.2002) (quoting *Scusa* ); *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986) ("Whether the activities complained of were unwelcome is usually disputed, as in the present case. In order to constitute harassment, the conduct must be 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive."); *Perkins v. U.S. Airways, Inc.*, 8 F.Supp.2d 1343, 1351 (M.D.Fla.1998) ("In order to prove the second element, unwelcome harassment, Plaintiff must show that he neither 'solicit[ed] nor incite[d] it, and ... that [he] regarded the conduct as undesirable or offensive.' *Bivins v. Jeffers Vet Supply*, 873 F.Supp. 1500, 1507 (M.D.Ala.1994), *aff'd* 58 F.3d 640 (11th Cir. 1995) (citation omitted)."); *Balletti v. Sun–Sentinel Co.*, 909 F.Supp. 1539, 1546–47 (S.D.Fla.1995) ("The conduct at issue 'must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.' *Henson [v. City of Dundee]*, 682 F.2d [897,] 903 [(11th Cir. 1982)]."); *Daka, Inc. v. Breiner*, 711 A.2d 86, 96 (D.C.Ct.App.1998) (" 'Unwelcome' conduct is conduct which the employee did not solicit or invite and which the employee regarded as undesirable or offensive.") (citation omitted). The United States District Court for the Western District of Missouri, in *Perkins v. General Motors Corp.*, 709 F.Supp. 1487 (1989), *aff'd in part and rev'd in part sub nom, Perkins v. Spivey*, 911 F.2d 22 (8th Cir.1990), *cert. denied, Perkins v. General Motors Corp.*, 499 U.S. 920, 111 S.Ct. 1309,

113 L.Ed.2d 243 (1991), set forth the various factors courts look at in determining the "welcomeness" aspect of a hostile work environment claim in the context of a sexual harassment claim. Therein, the court explained:

> The conduct complained of must be "unwelcome" in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive. In analyzing this element of a sexual harassment claim, courts have looked to a number of facts:
>
> a) Whether plaintiff by her own conduct indicated that the alleged sexual advances were unwelcome.
>
> b) Whether the plaintiff substantially contributed to the alleged distasteful atmosphere by her own profane and sexually suggestive conduct.
>
> c) Whether the plaintiff in response to evidence that at various times she had willingly participated in the conduct now complained of can identify with some precision a point at which she made known to her co-workers or superiors that such conduct would hencefore [sic] be considered offensive.
>
> d) Whether and, if so, when, plaintiff reported or complained about any of the incidents at issue.
>
> e) Whether plaintiff's account of the unwelcome sexual conduct is sufficiently detailed and internally consistent so as to be plausible.
>
> f) The nature of the work environment itself.

*Perkins*, 709 F.Supp. at 1499 (internal quotations and citations omitted).

 A determination of whether language or conduct is subjectively offensive and, therefore, actionable "depends on the individual circumstances". *Beach*, 312 F.3d at 396 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). In determining whether the conduct complained of is unwelcome and, therefore, actionable, a factual inquiry must be made into the totality of the circumstances, including examination of the plain-

tiff's own actions. As stated by the court in *Balletti*:

the court may consider whether the plaintiff participated in the very conduct of which she complains. Where a plaintiff's action in the work place shows that she was a willing and frequent participant in the conduct at issue, courts are less likely to find that the conduct was unwelcome or hostile. *See e.g. Reed v. Shepard*, 939 F.2d 484 (7th Cir.1991) (plaintiff could not argue that work environment was hostile where she instigated and participated in sexual horseplay and had one of the foulest mouths in the department); *Hicks v. Baltimore Gas*, 829 F.Supp. 791, 796 (D.Md. 1992), *aff'd*, 998 F.2d 1009 (4th Cir.1993), *cert. denied*, 510 U.S. 1059, 114 S.Ct. 726, 126 L.Ed.2d 690 (1994), *reh'g denied*, 511 U.S. 1102, 114 S.Ct. 1876, 128 L.Ed.2d 496 (1994) (plaintiff could not make out case of sexual harassment even though male co-workers called her names, sexually-oriented cartoons were posted on bulletin board, and one cartoon contained derogatory comments with her name; she admitted calling co-workers names, she subjected co-workers to offensive language, and her own behavior was erratic and angry); *Weinsheimer [v. Rockwell International Corp.]*, [754 F.Supp. 1559,] 1564 (M.D. Fla.1990), *aff'd*, 949 F.2d 1162 (11th Cir.1991) (conduct was not unwelcome where plaintiff made sexual gestures, told sexual stories, and was otherwise willingly involved in sexual innuendo prevalent at work); *Perkins v. General Motors Corp.*, 709 F.Supp. 1487, 1497–98 (W.D.Mo.1989), *aff'd in part and rev'd in part sub nom, Perkins v. Spivey*, 911 F.2d 22 (8th Cir.1990), *cert. denied, Perkins v. General Motors Corp.*, 499 U.S. 920, 111 S.Ct. 1309, 113 L.Ed.2d 243 (1991) (men in shop made catcalls, touched plaintiff's breasts, made comments about plaintiff's p[* * * *], placed a hot dog in a condom on plaintiff's desk, made humping and masturbation motions in front of plaintiff, told sexual jokes, shook their genitals at each other and used profanity; no hostile work environment was found, however, since plaintiff encouraged the conduct by herself using shop talk, goosing men, and referring to their geni-

tals as pickles, and where, on the few occasions that she did complain, the conduct was dealt with appropriately).

*Balletti*, 909 F.Supp. at 1547. A plaintiff's "willing and frequent involvement in the [allegedly offensive conduct] prevalent in her work area indicate[s] that she did not find the majority of such conduct truly 'unwelcome' or 'hostile'". *Weinsheimer v. Rockwell International Corp.*, 754 F.Supp. 1559, 1564 (M.D.Fla.1990). *See also, Loftin–Boggs v. City of Meridian, Miss.*, 633 F.Supp. 1323, 1327 (S.D.Miss.1986) ("Considering plaintiff's contribution to and apparent enjoyment of the situation, it cannot be said that the defendant's created 'an intimidating, hostile, or offensive working environment.' ... The context presented here is one of vulgar and unprofessional conduct by all, including plaintiff. While the situation was certainly not an effective working environment, it also was not the hostile environment prohibited by Title VII."). Where a plaintiff has initiated and/or participated in the offensive conduct without complaint, a claim based upon an allegation of a hostile work environment will ordinarily fail.

■ Plaintiff's participation in the offensive conduct complained of may not forever bar a hostile work environment claim where the plaintiff, at some point, makes clear that in the future such conduct will be deemed unwelcome and the conduct continues thereafter. *See, Weinsheimer*, 754 F.Supp. at 1564 n. 12 (finding participation in offensive conduct will not completely bar a harassment claim where plaintiff shows "that at some point she clearly made her co-workers and superiors aware that in the future such conduct would be considered 'unwelcome.' "); *Loftin–Boggs*, 633 F.Supp. at 1327 n. 8 (S.D.Miss.1986) ("Plaintiff's participation in the conduct leading to the creation of the alleged hostile environment does not permanently bar a successful claim of sexual harassment. Once her participation is established, however, she must be able to identify with some precision a point at which she made known to her co-workers or superiors that such conduct would henceforth be considered offensive."). In discussing the "welcomeness" aspect of the behavior at issue,

the Oregon Court in *Garcez* rejected the defendant's argument that the plaintiff therein welcomed the alleged harassing conduct because he,

> sometimes engaged in conduct similar to that which he claims was harassing, ... and, therefore, did not subjectively perceive the environment to be hostile. In support [of this argument] defendant emphasizes plaintiff's admission that he used terms such as "whitey" and "honkey," sometimes initiated the use of racial slurs, failed to indicate that he found the conduct offensive other than to merely "walk away," and admitted that some of his coworkers were not, at times, serious when they used racial slurs.
>
> Despite those admissions, though, we cannot say that no reasonable juror could conclude that plaintiff found the conduct unwelcome. Plaintiff testified that such conduct "might have been a joke to them, but it was no joke to me," that it made him "mad, unhappy, sad" and that his in-kind responses were merely a means of defending himself. A jury could reasonably believe that testimony and find that, at least some of the time, plaintiff was offended by his coworkers' conduct. In that regard, this case is distinguishable from *Reed v. Shepard,* 939 F.2d 484 (7th Cir.1991), and *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958 (8th Cir.1999), on which defendant relies. Although in those cases there was evidence that the plaintiffs had engaged in behavior that was similar to the conduct that they claimed was offensive, there also was evidence that their participation was usually, if not always, willing, that they initiated the conduct, and that they were not upset by it. *See Scusa,* 181 F.3d at 966 (noting that the plaintiff admitted that she had yelled at other employees, used foul language, and teased other employees); *Reed,* 939 F.2d at 487 (noting evidence that the plaintiff was put on probation for her use of offensive language, participated in suggestive behavior, and "reveled in the sexual horseplay"). The plaintiffs in those cases did not claim, as plaintiff does here, that their own offensive conduct was a coping mechanism for the harassment directed at them. Based

on the totality of the circumstances, plaintiff's evidence was sufficient to support a reasonable inference of unwelcomeness.

*Garcez,* 72 P.3d at 86 (footnote omitted).

Likewise, in *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473 (7th Cir.2004), the court found that the fact that the victim himself had used racist language did not lead inexorably to the conclusion that he welcomed racial harassment. In reviewing the district court's grant of summary judgment in favor of the employer, the Seventh Circuit Court of Appeals found that a factual issue existed as to whether the plaintiff welcomed the allegedly offensive racial comments, the court explaining:

> The first question is whether a reasonable jury could find that the allegedly harassing speech was unwelcome, a question that the district court resolved in Hrobowski's favor. Whether words or conduct were unwelcome presents a difficult question of proof turning largely on credibility determinations committed to the factfinder. *Reed v. Shepard,* 939 F.2d 484, 491 (7th Cir.1991). Worthington argues that any of the allegedly hostile words that Hrobowski encountered actually were welcome because, as Hrobowski admitted, he too made racially oriented jokes and used words such as "spic" and "n[* * * * *]" in the workplace. It is true that Worthington may not be held liable for a hostile environment that Hrobowski himself instigated. *See id.* In *Reed,* for example, we held that a directed verdict was appropriate against the hostile environment claim of a female jail employee whose preferred method of dealing with co-workers was with sexually explicit jokes, suggestions, and offers. *Id.*
>
> This case, however, is distinguishable from *Reed.* Reed admitted that she had never complained about the allegedly harassing conduct. *Id.* at 487. All of the evidence in the record, therefore, pointed to the conclusion that she welcomed the conduct on which she based her suit. Hrobowski, by contrast, points to competent evidence that he did object to the type of racist language to which he was subjected. In his deposi-

tion testimony, Hrobowski points out that he complained to managers Mark Stier and Pat Murley about racial language and jokes in the workplace. Although it is unclear when Hrobowski made these protests or exactly what he said to Stier and Murley (more about that later), a reasonable jury could conclude from this evidence that Hrobowski did not welcome racist speech, at least when he was the victim of that language. Thus, in this case, that the plaintiff himself used racist language does not lead inexorably to the conclusion that he welcomed the racial insensitivity of others. We therefore agree with the district court that a reasonable jury could find that the words on which Hrobowski predicates his claim for a hostile environment were unwelcome.

*Hrobowski*, 358 F.3d at 476.[15] These authorities make clear that a plaintiff who initially participates in the allegedly hostile conduct can not satisfy the "unwelcomeness" prong of a hostile work environment claim, *i.e.* that the complained of conduct was unwelcome, unless evidence is produced that at some point the plaintiff made clear to co-workers and superiors that such conduct would, in the future, be considered unwelcome and the conduct continued thereafter. Where such evidence is produced, a factual question is created as to whether the complained of conduct was "unwelcome".

■■■ The first prong of a hostile work environment claim under *Fairmont Specialty* requires a plaintiff to set forth evidence that the alleged offensive conduct was unwelcome. In light of the above authorities, we take this opportunity to clarify the evidence necessary to satisfy this burden where the plaintiff has participated in the subject conduct. In order to constitute harassment and satisfy the first prong of a hostile work environment claim as set forth in syllabus point 2 of *Fairmont Specialty Services v. West Virginia Human Rights Commission,* 206 W.Va. 86, 522 S.E.2d 180 (1999), the subject conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as

undesirable or offensive. When a plaintiff bringing a hostile work environment claim pursuant to the standards enunciated in syllabus point 2 of *Fairmont Specialty Services v. West Virginia Human Rights Commission,* 206 W.Va. 86, 522 S.E.2d 180 (1999), has solicited, incited or participated in the subject offensive conduct, the plaintiff must introduce evidence indicating (1) that he or she ultimately informed the involved co-workers and/or supervisors that future instances of such conduct would be unwelcome, and (2) that conduct thereafter continued. Where such evidence is produced, a question of fact is created as to whether or not the conduct was unwelcome.

■■■ Turning to the matters currently before this Court we first note that a finding of hostile work environment is "a legal conclusion inextricably bound to the facts[.]" *Fairmont Specialty,* 206 W.Va. at 95, 522 S.E.2d at 189. Under the established law outlined above, the Commission's order holding the appellants liable for a racially hostile work environment cannot stand. Mr. Peoples failed, as a matter of law, to satisfy the first element of a hostile work environment claim by failing to put forth evidence from which a reasonable fact-finder could conclude that the subject conduct was unwelcome.

The Commission found that Mr. Bragg's comment which formed the basis of the hostile work environment finding was predicated by Mr. Peoples' own taunts to Mr. Bragg calling him such racially-charged names as "honky" and "white trash". Indeed, it is difficult to ignore Mr. Peoples' own behavior in this incident. Not only did Mr. Peoples make fun of Mr. Bragg's speech impediment, it was Mr. Peoples who in fact first sparked the working environment with his racially-based taunting of Mr. Bragg. Mr. Bragg thereafter responded with one sentence, containing both a racial slur and a threat of physical violence, stating "you say another word I'll cut for f* * *ing head off with this shovel, n* * * * *." While we do not condone Mr. Bragg's comments, we cannot ig-

---

**15.** Ultimately, the Seventh Circuit affirmed the grant of summary judgment in favor of the employer finding there was no evidence that the employer was negligent in discovering or addressing racial harassment in the workplace. *Id.* at 478–79.

nore the significant role which Mr. Peoples had in creating the very situation of which he later complained—something Mr. Peoples appears to ignore and something which the Commission appears to have minimized.[16]

While most cases, including those cited above, involve an accumulation of incidents and the gradual development of hostilities, this case involves only one relatively brief exchange found to have been instigated by Mr. Peoples. Due to Mr. Peoples' incitement of and participation in the racially based comments, a prima facie showing that Mr. Bragg's response was "unwelcome" was not made. Additionally, because there is no evidence that the subject conduct continued after Mr. Peoples voiced an objection to Mr. Yontz, Mr. Peoples likewise fails to create a factual question as to whether such conduct was no longer welcome, yet continued. As such, Mr. Peoples' hostile work environment claim must fail as a matter of law because he failed to satisfy the first prong of the standard set forth in *Fairmont Specialty*.[17] Accordingly, we reverse the Commission's finding of hostile work environment.

## B.

### Retaliatory Discharge

■ Appellants also assign as error the finding of retaliatory discharge arguing that it is not supported by the law or evidence. Appellees maintain that the retaliatory discharge finding should be affirmed because the appellants are liable for the acts of their supervisory employee, Mr. Yontz, who

fired Mr. Peoples when he demanded action be immediately taken regarding the incident with Mr. Bragg. We agree with the appellants that under the facts and circumstances presented herein, the Commission erred in finding appellants liable for retaliatory discharge.

■ In syllabus point 4 of *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W.Va. 53, 365 S.E.2d 251 (1986), we set forth the legal standard that an employee must meet in order to succeed on a retaliatory discharge claim. Therein, we held:

> In an action to redress an unlawful retaliatory discharge under the West Virginia Human Rights Act, W. Va.Code, 5–11–1, *et seq.*, as amended, the burden is upon the complainant to prove by a preponderance of the evidence (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation) (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation.

Syl. pt. 4, *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W.Va. 53, 365 S.E.2d 251 (1986). The burden was upon Mr. Peoples to establish a prima facie case of retaliatory discharge. Syl. pt. 4, *Frank's Shoe Store*. Once Mr. Peoples met this burden, the burden shifted to the appel-

16. While Mr. Peoples' taunts of Mr. Bragg does not excuse Mr. Bragg's threatening response, they raise the question of welcomeness and mitigate against a finding of a hostile work environment, particularly where there were no prior incidents between the men or complaints.

17. Although we need not address whether Mr. Peoples' evidence was sufficient to satisfy the fourth prong of *Fairmont Specialty* governing imputing the conduct to the employer due to his failure to satisfy the first prong, we do note Mr. Erps' response upon learning of this situation. While Improvements Unlimited did not have an anti-harassment policy and procedure in place at the time of this incident, Mr. Erps did respond immediately upon learning of the situation. According to Mr. Peoples' own testimony, when he called Mr. Erps and informed him of the situa-

tion, Mr. Erps told him that he should not have been called that name and Mr. Erps would handle the situation when he returned to the office. Mr. Erps also testified that he told Mr. Peoples to return to work the next day, that he was not fired. The Chief Administrative Law Judge did not mention this in her findings and made no finding of fact as to whether it did or did not occur. Mr. Erps then obtained statements from witnesses, verbally instructed Mr. Bragg not to use that word again and affirmatively attempted on two occasions to speak with Mr. Peoples about the incident when Mr. Peoples came to pick up his paychecks, but Mr. Peoples left before speaking with Mr. Erps. These facts raise significant questions as to whether Mr. Peoples would have been able to satisfy the fourth prong of *Fairmont Specialty*.

lants to rebut the presumption and, if appellants are successful in rebutting the presumption, the burden then shifts back to Mr. Peoples to prove by a preponderance of the evidence that the explanation given by appellants was merely pretextual. *See*, syl. pt. 3, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983) (explaining shifting burdens in action to redress unlawful workplace discrimination). *See also*, *Freeman v. Fayette County Bd. of Educ.*, 215 W.Va. 272, 277–78, 599 S.E.2d 695, 700–01 (2004) (*per curiam* ) (explaining shifting burdens of proof); *Hanlon*, 195 W.Va. at 105–06, 464 S.E.2d at 747–48 (same); *West Virginia Dept. of Natural Resources v. Myers*, 191 W.Va. 72, 76, 443 S.E.2d 229, 233 (1994) (*per curiam* ) (same).

If we assume that Mr. Yontz's actions at a remote worksite in "firing" Mr. Peoples when Mr. Peoples refused to return to work until Mr. Bragg's conduct was addressed would be sufficient to meet Mr. Peoples' burden of establishing a prima facie case of retaliatory discharge as set forth in *Frank's Shoe Store*, then the burden shifted to the Appellants to rebut. In rebuttal, Appellants produced evidence that Mr. Peoples was fired for failure to return to work, not complaining of Mr. Bragg's comments. The burden then shifted back to Mr. Peoples to demonstrate that the proffered reason was merely pretextual. Mr. Peoples failed to present any evidence that the legitimate, non-retaliatory explanation given by Mr. Erps and Improvements Unlimited for his termination was merely pretextual.

It is undisputed that the incident at issue herein was an isolated event at a construction site in Virginia between two co-workers who had no prior reported history of conflict with one another. The crew leader, Mr. Yontz, upon learning of the situation, separated the men and ordered them back to work in accordance with his prior training in conflict management. While the Chief Administrative Law Judge and, ultimately, the Commission found that Mr. Yontz "terminated" Mr.

Peoples immediately after Mr. Peoples refused to return to work until the racial slur and threat of physical violence were addressed and that a retaliatory motive could be inferred, such a finding can only be deemed to be clearly wrong under the facts presented herein. The evidence simply does not support a factual finding that either Mr. Yontz or Mr. Erps terminated Mr. Peoples in retaliation for the protected activity of raising the issue of racial harassment. Mr. Yontz's decision to terminate Mr. Peoples was based upon Mr. Peoples' refusal to return to work. Indeed, Mr. Peoples himself admitted that, upon being informed of the incident, Mr. Erps told him that Mr. Erps would handle the matter when he returned to the office and that it should not have happened. Mr. Erps also informed Mr. Peoples that he was not terminated and that he should return to work the following morning. Mr. Peoples, however, failed to return to work and returned to the office only long enough to collect his pay.[18] Mr. Peoples' failure to present evidence that the reason given by Improvements Unlimited for his initial termination, *i.e.* his refusal to return to work, was pretextual, precludes his claim for retaliatory discharge as a matter of law. Accordingly, we reverse the Commission's order to the extent it holds the appellants liable for retaliatory discharge.

### C.

### Retaliation for Filing a Complaint

In the April 6, 2007, order, which was affirmed by the Commission, the Chief Administrative Law Judge found Improvements Unlimited subjected Mr. Peoples to retaliation for filing a complaint with the Commission through a series of actions such as following him, staring at him and offering him money to dissuade him from pursuing his complaint. This finding is based upon the Chief Administrative Law Judge's finding that Mr. Peoples' testimony regarding Claude Erps' worker's attempt to intimidate

---

**18.** Based upon the unrebutted testimony of Mr. Erps, Mr. Peoples' lack of employment arguably was something within his own control.

him[19] and Brian Eaves' attempt to give him money to drop his complaint[20] were credible. Appellants presented testimony contradicting Mr. Peoples, including the testimony of Claude Erps. Appellants also challenged Mr. Peoples testimony regarding Mr. Eaves' alleged offer on hearsay grounds arguing that Mr. Eaves did not testify and that Mr. Peoples' version of the event is based upon his subjective "feelings." Because the findings on this issue are made upon credibility determinations in light of competing testimony, they are to be afforded deference. Accordingly, we affirm the finding that Mr. Peoples was intimidated and retaliated against for filing his complaint with the Commission. However, we note that Mr. Peoples was not awarded monetary damages for this alleged retaliation and intimidation.[21] Moreover, Mr. Peoples neither appealed this aspect of the order below, nor did he take exception to it before this Court. The directives contained within the April 6, 2007, order regarding the adoption, implementation and enforcement of an anti-harassment policy are sufficient remedies under the circumstances presented herein. The Commission may not, hereafter, award monetary damages for this claim because monetary damages were not previously awarded for this specific retaliation claim in the appealed orders and no exception to this lack of monetary damages being awarded on this issue was taken by Mr. Peoples.

## IV.

## CONCLUSION

The January 30, 2008, order of the West Virginia Human Rights Commission is reversed to the extent that it finds the appellants liable for hostile work environment and retaliatory discharge and imposes monetary damages, including costs, upon them. The January 30, 2008, order of the West Virginia Human Rights Commission is affirmed to the

19. Mr. Peoples testified that one night when he left a bar he frequented he saw a van with the Erps name on it, a large man got out of the vehicle and chased him across a bridge.

20. Mr. Peoples testified that Brian Eaves, another African–American employee of Improvements Unlimited, approached him at a bar and attempted to hand him money stating that the Erps knew a lot of people. Mr. Peoples stated this gave him

extent it finds appellants liable for intimidating and retaliating against Mr. Peoples for filing a complaint with the West Virginia Human Rights Commission and directing the implementation of an anti-harassment policy and procedure at Improvements Unlimited.

**Affirmed, in part, and Reversed, in part.**

the impression Improvements Unlimited had sent Eaves to pay him off.

21. The April 6, 2007, order specifically relates the award of incidental damages to Mr. Peoples feeling "degraded" and "humiliated" after being called the "n" word, terminated and having no choice but to walk home.