695 S.E.2d 854

PAR ELECTRICAL CONTRACTORS, INC., Plaintiff Below, Appellant,

v.

Richard Wayne BEVELLE and the West Virginia Human Rights Commission, Defendants Below, Appellees.

No. 35302.

Supreme Court of Appeals of West Virginia.

Submitted April 14, 2010.

Decided June 3, 2010.

Eric W. Iskra, Esq., Richard M. Wallace, Esq., Spilman Thomas & Battle, PLLC, Charleston, WV, for Appellant.

Kathryn Reed Bayless, Esq., Bayless Law Firm, PLLC, Princeton, WV, for Appellee Bevelle.

PER CURIAM:

In this appeal, we are asked to examine a decision of the West Virginia Human Rights Commission which held that an employer permitted a racially hostile work environment to exist, and that the employer failed to take swift and decisive action to eliminate that environment.

After careful consideration of the record developed before the Commission, we find that the Commission's decision was supported by substantial evidence and should be affirmed.

## I.

### Facts and Background

Appellee Richard Wayne Bevelle is African–American. He worked for the appellant, PAR Electrical Contractors, Inc. ("PAR"), helping to build giant towers for a high voltage electrical transmission line. Specifically, Mr. Bevelle was assigned to load helicopters with parts to construct the towers.[1]

On September 19, 2005, three people were talking and working at a helicopter landing site: the appellee, Mr. Bevelle; Mr. Bevelle's supervisor, Don Sines; and another PAR foreman, Kevin Tabor. Mr. Bevelle was the only African–American among the three. In the course of the conversation, Mr. Tabor told Mr. Bevelle, "If I was your boss, I would fire you for not joining the KKK." Mr. Sines then said to Mr. Tabor, "Well, he can't join the KKK, he's already a member, probably, of the NAACP." Mr. Bevelle responded, "I don't play that," and walked a short distance away.

Mr. Tabor and Mr. Sines continued to talk. In their conversation, the word "n* * * * *" was used multiple times. After several minutes of discussion, Mr. Tabor walked over to appellee Bevelle and, employing what an administrative law judge later termed "offensive elaborations," explained

---

1. Mr. Bevelle was praised by the owner of the helicopter company because his scheduling efforts reduced the time to load the helicopters, reducing wear and tear on the engines and resulting in cost savings for the helicopter company and appellant PAR.

that Mr. Bevelle had misunderstood what Mr. Tabor had meant. Mr. Tabor explained that "there's all kinds of n* * * * *s. There's white n* * * * *s, too." Mr. Bevelle responded, "No, there's not."

Appellee Bevelle attempted to tell Mr. Tabor that he evidently didn't know what the "n-word" meant, but Mr. Tabor explained: "No, no. Anybody, if you're white and you walk around on drugs, you can figure that's a n* * * * * to me." Mr. Bevelle again said, "I don't play that." Mr. Tabor responded, "Well, I don't classify you as a n* * * * * because you work for a living." Mr. Bevelle stared at Mr. Tabor for a moment, then walked away and got in his truck.

Mr. Bevelle thought about Mr. Sines's and Mr. Tabor's repeated use of the "n-word" and references to the KKK for the rest of the day and that evening, growing more and more angry. The next morning, Mr. Bevelle reported the incident to Gary Graham, safety manager for appellant PAR. Mr. Graham invited Mr. Bevelle's supervisor, Mr. Sines, to participate in the conversation, and told Mr. Bevelle that he would look into the incident because such language was totally inappropriate.

After making that report to Mr. Graham, as appellee Bevelle prepared to get in a truck to return to his helicopter worksite, supervisor Sines intercepted Mr. Bevelle and told him he was being reassigned, immediately, to other duties. Mr. Bevelle never asked to be reassigned, and no one explained to him why he was being reassigned. Further, his job at the helicopter landing site was apparently given to another PAR employee, and Mr. Tabor continued working as a foreman at the landing site.

Mr. Bevelle's new work assignment required him to work at the base of newly-assembled towers 150 to 200 feet high as other employees climbed the towers and attached various parts. Mr. Bevelle's new job was, in part, to place bolts, nuts, tools and other materials into a bag, and use a rope and pulley to transfer the supplies to workers high up on the tower. But another component of the new job was to pick up tools, bolts and parts that had been dropped by the workers high up on the tower.

Mr. Bevelle testified that he was fearful of his new assignment, fearful that he might be "accidentally" hurt by an item dropped by a fellow worker—all of whom were apparently white—after reporting Mr. Tabor's racial remarks. Mr. Bevelle knew that the workers on the towers had been assigned to work with Mr. Tabor in the past on other jobs. They had traveled with Mr. Tabor, lived near Mr. Tabor, and generally knew him far better than they knew Mr. Bevelle. Mr. Bevelle also knew that tools on the job site weighed as much as six or seven pounds, and items like bolts were six inches long and two inches in circumference.

Furthermore, during the course of a routine safety meeting attended by about 100 workers—Mr. Bevelle was the only African-American in the group employed by PAR—PAR told its employees and sub-contractors that racial comments would not be tolerated. Mr. Bevelle believed, "as the only black face that [he] saw" on the PAR job site, that all of the employees of PAR knew he had made a complaint to management. Shortly thereafter, Mr. Bevelle quit his job with PAR.

On June 13, 2007, appellee Bevelle filed a complaint against appellant PAR, pursuant to the West Virginia Human Rights Act, with the Commission. Mr. Bevelle alleged that he had been discriminated against on the basis of his race, and retaliated against for complaining about racial harassment by his employer.

After a hearing before an administrative law judge, on May 8, 2008 the Commission entered an order finding that PAR had permitted a hostile or abusive work environment on the basis of race to exist on its worksite, and that PAR had failed to promptly address the racial discrimination toward Mr. Bevelle.

PAR appealed the Commission's order to the Circuit Court of Kanawha County, and on July 29, 2009 the circuit court entered a decision affirming the Commission's order. PAR now appeals to this Court.

## II.

### Standard of Review

In appeals of cases from the Human Rights Commission to the circuit court or

this Court, the standard of judicial review is set by statute in *W.Va.Code*, 29A–5–4(g) [1998]. We discussed this standard in Syllabus Point 2 of *Shepherdstown Volunteer Fire Dep't v. State ex rel. State Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983), where we held:

> Upon judicial review of a contested case under the West Virginia Administrative Procedure Act, Chapter 29A, article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions, or order are: '(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.'

■ Furthermore, we explained the procedure to be followed by the reviewing court in *Frank's Shoe Store v. West Virginia Human Rights Commission*, 179 W.Va. 53, 56, 365 S.E.2d 251, 254 (1986):

> [A] reviewing court must evaluate the record of the agency's proceeding to determine whether there is evidence on the record as a whole to support the agency's decision. The evaluation is conducted pursuant to the administrative body's findings of fact, regardless of whether the court would have reached a different conclusion on the same set of facts.

"[The] West Virginia Human Rights Commission's findings of fact should be sustained by reviewing courts if they are supported by substantial evidence or are unchallenged by the parties." Syllabus Point 1, *West Virginia Human Rights Commission v. United Transportation Union, Local No. 655*, 167 W.Va. 282, 280 S.E.2d 653 (1981).

## III.

### Discussion

Appellant PAR wisely concedes that the language employed by Mr. Tabor and Mr. Sines was inappropriate. Still, PAR argues that the decision of the Human Rights Commission was plainly wrong because: (a) only a "single incident" of racist language occurred in the workplace, (b) the "single incident" was insufficient to create a hostile working environment, and (c) PAR promptly took remedial action to correct the problem.

In essence, appellant PAR is asking that this Court reassess the Commission's findings of fact, and to substitute a new interpretation of the evidence. This we decline to do.

■ First, while appellant PAR asserts that only a "single incident" of racist language occurred, the record indicates something wholly different. PAR foreman Mr. Tabor, and supervisor Mr. Sines, did not accidentally or in frustration release a racial expletive toward Mr. Bevelle. Instead, the record shows Mr. Bevelle was repeatedly and deliberately subjected to race-based comments, and a suggestion that he should be fired for not joining in the KKK. When Mr. Bevelle disengaged from the conversation between Mr. Tabor and Mr. Sines, the race-based language continued loud enough for Mr. Bevelle to hear. And Mr. Tabor later approached appellee Bevelle and used "offensive elaborations" to explain what he meant. On this record, we decline PAR's invitation to reinterpret the Commission's findings and hold that only a "single incident" of racially-hostile language was used on the PAR worksite.[2]

---

2. PAR's interpretation that what happened to Mr. Bevelle was an "isolated incident" of racial misconduct has its origin in a footnote near the end of our opinion in *Fairmont Specialty Services v. West Virginia Human Rights Com'n*, 206 W.Va. 86, 96 n. 9, 522 S.E.2d 180, 190 n. 9 (1999). In footnote 9 of that opinion, we said that "[a]s a

general rule, 'more than a few isolated incidents are required' to meet the pervasive requirement of proof for a hostile work environment case." That footnote is tempered, however, by footnote 8 of the same opinion, where we said:

Second, appellant PAR suggests that the repeated racial comments used between Mr. Tabor and Mr. Sines were insufficient to create a hostile environment for the appellee, Mr. Bevelle. As support, PAR cites to our recent decision in *Erps v. West Virginia Human Rights Com'n*, 224 W.Va. 126, 680 S.E.2d 371 (2009), where we concluded that a racial comment by one co-worker toward another was insufficient to create a hostile work environment. We believe that *Erps* is easily distinguishable for two reasons. First, in *Erps*, there was only one racially-based comment yelled in frustration after some provocation[3]; in the instant case, the racially-based comments were repeated and deliberate, and made without provocation or invitation by the appellee. Second, the sole race-based comment in *Erps* was uttered between equally situated co-workers; in the instant case, the repetitive race-based comments were uttered by two supervisors about and toward a subordinate. We therefore believe that the Commission's ruling that a hostile work environment existed is supported by the record.

■ Finally, appellant PAR asserts that—even if a hostile work environment on the basis of racial discrimination did exist—the Commission mistakenly concluded that PAR failed to take swift and decisive action to eliminate the discriminatory conduct.

■ In Syllabus Point 3 of *Fairmont Specialty Services v. West Virginia Human Rights Com'n*, 206 W.Va. 86, 522 S.E.2d 180 (1999), we set out the following guide to determine whether an employer has promptly rectified a hostile work environment:

> Conduct such as use of the "N" word to describe an African–American, the "C" word to describe women, the terms "Sic," "W.P." or "Jap" to describe those of other ancestral heritages, or other racial, sexual or ethnic pseudonym, intended to denigrate others, cannot be tolerated in the workplace. They are the type of outrageous discriminatory conduct that may be considered to be of an aggravated nature such that the threshold for it to be actionable is much lower than more subtle forms of discrimination which cumulatively cause conduct to be actionable under the Human Rights Act.

206 W.Va. at 93 n. 8, 522 S.E.2d at 187 n. 8.
Remarkably, although appellant PAR's argument is largely based upon footnote 9 of *Fairmont Specialty Services*, PAR belittles the quality

The aggravated nature of discriminatory conduct, together with its frequency and severity, are factors to be considered in assessing the efficacy of an employer's response to such conduct. Instances of aggravated discriminatory conduct in the workplace, where words or actions on their face clearly denigrate another human being on the basis of race, ancestry, gender, or other unlawful classification, and which are clearly unacceptable in a civilized society, are unlawful under the West Virginia Human Rights Act, West Virginia Code §§ 5–11–1 to –20 (1999), and in violation of the public policy of this State. When such instances of aggravated discriminatory conduct occur, the employer must take swift and decisive action to eliminate such conduct from the workplace.

The record below indicates that the only "swift and decisive action" taken by appellant PAR was to transfer appellee Bevelle from a job that he had performed well to a much more dangerous worksite. Mr. Bevelle's job at the helicopter landing site was given to another employee. There was no evidence in the record that foreman Tabor or supervisor Sines were ever sanctioned in any way for their conduct. In fact, PAR continues to argue in its brief on appeal that Mr. Tabor could not be sanctioned "[b]ecause Mr. Tabor was a foreman with specialized skills [and] his job required him to be at or near the helicopter pad" whereas appellee Mr. Bevelle was merely "an entry-level groundman" who likely would have been reassigned to a different position in the future anyway. On this record, given the aggravated nature of the

of appellee Bevelle's position for relying upon footnote 8 as authority. *See Appellant's Reply Brief* at 3 ("The *only* legal authority that Mr. Bevelle relies on for this proposition, which underpins his entire theory of liability in this case, is a *footnote* from *Fairmont Specialty Serv* ..."). In the instant case, we believe that the Commission has properly interpreted and applied *both* of these footnotes to the evidence of record.

3. In *Erps*, an African–American worker was chiding a white co-worker about the quality of his work, and the white worker responded, "You say another word I'll cut your f* * *ing head off with this shovel, n* * * * *." 224 W.Va. at 130, 680 S.E.2d at 375.

discriminatory conduct toward Mr. Bevelle, we believe it was fair for the Commission to conclude that PAR failed to take swift and decisive action to eliminate such conduct from the workplace.

## IV.

### *Conclusion*

After careful consideration of the record, the circuit court's July 29, 2009 order upholding the May 8, 2008 order of the Human Rights Commission was correct and must be affirmed.

Affirmed.